Julius DUCRE

v.

MINE SAFETY APPLIANCES, et al.

Civ. A. No. 80–4338.

United States District Court,
E.D. Louisiana.

Oct. 14, 1983.

Orleans, La., for Mine Safety Appliances Co.

James L. Donovan, Metairie, La., for Transamerica Ins.

Orlando G. Bendana and Wayne H. Carlton, Jr., Bendana & Carlton, New Orleans, La., for plaintiff.

Bailey & Leininger, Leon A. Aucoin and Mark D. Kuss, Metairie, La., for intervenor.

Lawrence J. Ernst, Christovich & Kearney, New Orleans, La., for Pulmosan Safety Equipment Corp.

Andre J. Mouledoux, New Orleans, La., for Traders & General Ins. Co.

Craig R. Nelson, Hulse, Nelson & Wanek, New Orleans, La., for American Universal Ins. Co., Clemco Industries.

Sondra A. Cheek, Bogalusa, La., for L. Cunningham, M. Altmann, E. Cunningham and A. Seligman, R. Seligman, C. Smith, H. Gaines, J. Henderson.

Thomas E. Loehn, New Orleans, La., for Commercial Union Ins. Co.

Bruce J. Borrello, Metairie, La., for Liberty Mut. Ins. Co.

Emery N. Voorhies, Normann & Normann, for Fidelity & Cas. Ins. Co.

Frank J. Peragine, Michael R. Daigle, New Orleans, La., for American Optical Corp.

Charles Hanemann, Jr., Henderson, Hanemann & Morris, New Orleans, La., for 3M.

Vance E. Ellefson, William J. Larzelere, Jr., Anthony J. Staines, Lugenbuhl, Larzelere & Ellefson, New Orleans, La., for Robert Gardebled, Harold Halter, Richard Neyland, Mirl Halter, James Dubuisson, Codee Brogan, Joseph Norra and Calvin Luc.

Gary M. Zwain, Johnston & Duplass, Robert M. Johnson, New Orleans, La., for Pulmosan Safety Equipment Corp.

Jones, Walker, Waechter, Poitvent, Carrere & Denegre, James L. Selman, II, New

## OPINION

ARCENEAUX, District Judge.

Plaintiffs in these consolidated cases claim damages resulting from allegedly contracting silicosis while employed at various shipyards in Louisiana.

Initially filed as individual suits and allotted to various sections of this Court, discovery and the filing of various pre-trial motions pointed to the presence of two issues of Louisiana law—to be defined and discussed more fully later herein—in a number of the pending matters. In the interest of judicial economy and of avoiding inconsistent decisions, the Court and counsel, assisted by the Hon. Michaelle P. Wynne, U.S. Magistrate, reviewed all cases on the docket of the Eastern District of Louisiana in which "the two issues" might be contained.

Before discovering the issues common to these cases, this Court considered, and ruled upon, the first such issue, holding on April 15, 1983 in the "lead" case of *Julius Ducre v. Mine Safety Appliances, et al.* that the 1976 Amendment to the Louisiana Workmen's Compensation Law barred negligence-based lung damage suits by former employees against executive officers of a covered employer where the disease did not manifest itself until after the effective date of the Amendment. Since the Court found claims for liability barred, it was unnecessary to reach the second issue common to these cases, insurance coverage afforded by Commercial Union Insurance Company under the terms of its policy.

After this ruling, as a result of the docket-study referred to above, counsel and the Court realized the extent to which the two issues were present in other pending cases; the appropriate causes were identified and then were transferred to this section of the Court. All of these cases have been consolidated with *Ducre.*

Thus, the Court now has before it essentially two groups of cases.

The first group is composed of diversity jurisdiction-based cases brought by former employees of Southern Shipbuilding Corporation and Halter Marine, Inc. against various safety appliance manufacturers; these direct defendants have exerted third party claims against executive officers of the respective former employers. The employers have joined, as third parties, their liability insurer, Commercial Union Insurance Company, which has denied coverage.

The second group of cases involves essentially the same scenario; however, the claims against the executive officers are brought under the Court's pendent, rather than diversity, jurisdiction. The executive officers of the former employer, Avondale Shipyards, Inc., are therefore direct defendants to the claims of their respective former employees.

For ease of reference, the first classification of cases is hereinafter referred to as the "Southern—Halter cases". The second classification is hereinafter referred to as the "Avondale cases".

Fifty-seven cases were consolidated, of which twelve are Southern—Halter cases, and forty-five are Avondale cases.

All plaintiffs allege serious and life-destroying progressive lung disease—silicosis.

The "two issues" are present in all cases.

## I.

## EXECUTIVE OFFICER LIABILITY

*Southern-Halter Cases:*

Pulmosan Safety Equipment Corporation ("Pulmosan"), Mine Safety Appliances Company ("Mine Safety"), Minnesota Mining and Manufacturing Company ("3M"), and Clemco Industries ("Clemco") have moved the Court to reconsider its April 15, 1983 opinion which ordered the partial grant of a motion for summary judgment filed by the executive officers of Halter Marine, Inc. and which opinion was later made applicable to the executive officers of Southern Shipbuilding Corporation on July 6, 1983. After considering the memoranda and the law, the Court hereby GRANTS the motions to reconsider and VACATES its previous orders for reasons set forth hereinafter.

The Court previously held that the prohibition against negligence actions against an employer's executive officers for job related injury contained in the 1976 Amendments to the Louisiana Workmen's Com-

pensation Act, La.Rev.Stat. 23:1032, controlled in the matter *sub judice.* The Court still considers that, insofar as these motions are concerned, plaintiffs' causes of action accrued for purposes of liberative prescription after the effective date of the 1976 amendments, but it now holds that the date prescription begins to accrue does not determine the substantive rights and liabilities of the parties.

The 1976 Amendment should not be applied retroactively to claims arising prior to the amendment. *Bostick v. International Mineral & Chemical Corp.*, 360 So.2d 898 (La.App.1978). Louisiana courts have long recognized this rule in cases involving single tortious incidents. *Richard v. Hebert's Creamery, Inc.*, 359 So.2d 1088 (La.App.1978); *Wilkinson v. Viccinelli*, 359 So.2d 634 (La.App.1978), *writ denied*, 360 So.2d 198 (La.1978). Further, it is apparent that this rationale is founded on the potential unconstitutionality of a contrary holding:

> U.S. Const. Art. 1, § 10 prohibits a state from passing a retroactive law that would destroy a vested right of a citizen or impair the obligation of a contract, while the Fourteenth Amendment guarantees the citizen against loss of a property right without due process of law. See also La. Const. 1974, Art. 1, § 23. The right to file a damage suit in tort is a vested property right. If we were to give retroactive effect to the amending language of R.S. 23:1032, we would effectively terminate plaintiff's right and in so doing give an unconstitutional interpretation of the statute. (citation omitted). *Green v. Liberty Mutual Insurance Co.*, 352 So.2d 366, 369 (La.App. 1977); *writ denied*, 354 So.2d 210 (La. 1978).

Likewise, this Court believes that to hold the executive officers immune from alleged negligence actions because the plaintiffs were unaware of their injuries would unconstitutionally divest the interested parties of a property right.

The Louisiana Supreme Court defines cause of action as "the state of facts which gives a party the right to judicially assert an action against a defendant." *Trahan v. Liberty Mutual Insurance Co.*, 314 So.2d 350, 353 (La.1975). The existence of that right is not necessarily conditioned on knowledge of the ultimate injury. A cause of action accrues when a party first could have maintained his action to a successful result. 1 Am.Jur.2d Actions § 10. The essential elements of a good cause of action are the existence of a legal right in the plaintiff, with a corresponding legal duty in the defendant, and a violation or breach of that right or duty with consequential injury or damage to the plaintiff for which he may maintain an action for the recovery of money damages or other appropriate relief. 1 Am.Jur.2d Actions § 59. Thus, a cause of action may exist, but be unknown to a party. In such instances, where the tort is a continuing one, the courts have held that liberative prescription runs only from the date the plaintiff knew or should have known of the injury. This rule, of course, governs cases involving occupational injuries such as long developing diseases of the lung.[1]

Granting that "a cause of action [is] an act by a defendant which gives a party a right to invoke judicial interference", *Trahan, supra* at 353, the existence of that right, in cases such as this, should not be tested against the requirement of a party's knowledge, except for purposes of fixing a date on which prescription will begin to run. *See*, 1 A.L.R. 4th 117 "When Statute

---

1. Occupational diseases of the kind at hand are particularly difficult to classify pragmatically within the structured concepts of traditional tort law. These are "a new and different species of injury", as observed by Judge Goldberg, dissenting in *Thompson v. Johns-Manville Sales Corp., et al.*, 714 F.2d 581, 583 (5th Cir.1983) (Goldberg, J., dissenting): "... the factual predi- cate giving rise to potential liability" in occupational lung disease cases such as these are "simply different from those that generated most tort doctrines", and thus they differ "... in legally important aspects from those types of injuries that present tort doctrines were designed to accommodate". *Thompson, supra* at 584.

of Limitations Begins to Run as to Cause of Action for Development of Latent Industrial or Occupational Disease" at 121, *et seq.*

■ This is a classic example of continuing tortious acts. As to any damages caused prior to the appropriate prescription measuring date, the complained of acts of the executive officers continued daily. While these alleged acts continued, prescription was suspended, protecting the cause of action from a time-bar defense. These repeated and continuing acts, which gave rise to successive damages from day to day, are cognizable in a single action rather than in successive actions. *Wilson v. Hartzman,* 373 So.2d 204, 207 (La.App. 1979), *writ denied,* 376 So.2d 961 (La.1979). The Louisiana legislature could not constitutionally withdraw either the right or the remedy as to accrued claims for damages, which existed, albeit unknown, at the time.

Therefore, this Court holds that the executive officers can be held liable, at a minimum, for negligent acts shown to have resulted in some injury before the effective date of the 1976 Amendment; however, negligence-based claims for injuries occurring post-Amendment are time-barred.

This Court recognizes the potential difficulty in isolating, at a given point, the extent of injury in cases where "the injurious consequences of the exposure are the product of a period of time rather than a point in time ..." *Urie v. Thompson,* 337 U.S. 163, 170, 69 S.Ct. 1018, 1025, 93 L.Ed. 1282 (1949). However, this Court cannot ignore the parties' rights to have an opportunity to establish facts sufficient to prove a physical abnormality, in and of itself, diagnosable before 1976 and caused by the negligence of the executive officers which may have constitutionally vested prior to that date.

The Court's original opinion as it relates to allegations of intentional tort remains unchanged.

Therefore, in accordance with this opinion:

The motions of Pulmosan Safety Equipment Corporation, Mine Safety Appliances Company, Minnesota Mining and Manufacturing Company and Clemco Industries to reconsider will be granted;

This Court's orders of April 15, 1983 and July 6, 1983 partially granting the motions for summary judgment filed by the executive officers of Halter Marine, Inc. and of Southern Shipbuilding Corporation will be vacated; and,

The motions for summary judgment filed by the executive officers of Southern Shipbuilding Corporation and of Halter Marine, Inc. will be partially granted.

*Avondale Cases:*

For the reasons assigned in the Southern—Halter cases, the motion for summary judgment of the executive officers of Avondale Shipyards, Inc. will be partially granted. Since the complaints state a claim on the face of the pleadings and the Court is restricted to the pleadings in measuring the merit of the motion, Avondale's Fed.R. Civ.P. 12(b)(6) motion to dismiss for failure to state a claim will be denied.

II

SCOPE OF COMMERCIAL UNION INSURANCE COMPANY POLICY COVERAGE

*Southern—Halter Cases:*

This issue arises on motion of Commercial Union Insurance Company ("Commercial Union") for summary judgment. Commercial Union claims that its policies of general liability insurance do not afford coverage to executive officers of its employer-insureds as to claims by employees for personal injuries which "occur" outside the policy period. Having considered the memoranda and the law, the Court finds that the motion should be partially granted for reasons set forth hereinafter.

Commercial Union provided insurance to Southern Shipbuilding Corporation ("Southern") during the times the plaintiffs worked at Southern. The insurance poli-

cies typically contained the following "Insuring Agreements":

1. Coverage A—Bodily Injury Liability: (Insurer agrees to pay) on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by any person and caused by an accident.

These policies, insofar as their provisions are relevant here, are commonly referred to as "occurrence" policies, since they contain the following "Occurrence Endorsement":

Such insurance as is afforded by the policy for Bodily Injury Liability ... applies subject to the following provisions:

1. In Insuring Agreement I, the words "caused by accident" are deleted.

2. The term "occurrence" is substituted for "accident" wherever else it appears, except in the "Defense; Settlement; Supplementary Payments" insuring agreement and "Assistance and Cooperation" condition.

3. "Occurrence" means either an accident or a continuous or repeated exposure to conditions which results during the policy period in injury to persons or real or tangible property which is accidentally caused. All damages arising out of such exposure to substantially the same conditions shall be considered as arising out of one occurrence.

4. Under the Bodily Injury Liability Coverage, injury intentionally inflicted shall be deemed an accident unless committed by or at the direction of the insured.

Commercial Union argues that these policy provisions exclude coverage for both negligent and intentional acts of Southern's executive officers which allegedly caused plaintiffs' silicosis, as set forth in third party complaints.

■ In a diversity case, a federal court adopts the choice of law rule of the forum state. Louisiana follows the general choice of law rule that the nature, validity, and construction of a contract are to be determined by the law of the place where it was made. *Porter v. American Optical Group,* 641 F.2d 1128, 1144 (5th Cir.1981), *cert. denied,* 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981). Accordingly, the Louisiana rule that contracts are to be interpreted according to the intent of the parties as determined from the words of the contract when those words are clear and explicit and lead to no absurd consequences applies in the matter *sub judice.* La.Civ.Code art. 1945; *Battig v. Hartford Accident and Indemnity Co.,* 482 F.Supp. 338 (W.D.La.1977), *aff'd,* 608 F.2d 119 (5th Cir.1979).

■ The Louisiana courts which have interpreted identical "occurrence" provisions have found that "the policy stipulates in clear, unambiguous language that coverage is provided only for ... damage which occurs during the policy period" and that such exclusion does not violate public policy. *Oceanonics, Inc. v. Petroleum Distributing Co.,* 292 So.2d 190, 191–192 (La. 1974). Further, this Court is persuaded by the resulting application of this same rule of contract interpretation in other jurisdictions, that the resulting injury, and not the exposure, must occur during the policy period in order to trigger coverage. *Eagle Picher Industries v. Liberty Mutual Insurance Co.,* 523 F.Supp. 110 (D.Mass. 1981), *modified on other grounds,* 682 F.2d 12 (1st Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1279, 75 L.Ed.2d 500 (1983). However, this Court believes that the clear meaning of the words in the exclusion do afford coverage for any "real but undiscovered injury proved in retrospect to have existed at the relevant time ... irrespective of the time the injury became manifested". *See, American Home Products Corp. v. Liberty Mutual Insurance Co.,* 565 F.Supp. 1485 (S.D.N.Y.1983). Therefore, to the extent that such can be established during the policy period, coverage is available under the policy terms.

The Court does not believe that this holding conflicts with *Porter, supra.* Not only was that case decided under the terms of

different policy provisions, *Porter, supra* at 1145, but neither the District Court nor the Fifth Circuit addressed the interpretation of the exact policy provision here presented. Rather, they found the insurer liable under a different policy and provision, and "passed" on the present issue, its application not being relevant in the light of policies which did afford coverage. *Porter, supra* at 1143, fn. 18.

■ As the exclusion relates to the alleged intentional acts of the executive officers, it is equally clear that the policy does not provide coverage for any act committed by or at the direction of an executive officer acting within the scope of his duties. There is, therefore, no coverage for the intentional acts of an executive officer. However, the policy does provide coverage to the extent that an executive officer may be held vicariously liable for the intentional acts of another.

Accordingly, the motion for summary judgment filed on behalf of Commercial Union Insurance Company will be partially granted in accordance with this opinion.

*Avondale Cases:*

All parties having agreed that Louisiana law applies, Commercial Union filed motions for summary judgment in the Avondale cases identical to those filed in the Southern—Halter cases. In opposition, Avondale's executive officers have adopted the Southern—Halter officers' legal positions and arguments. They further assert that, because the "Occurrence Endorsement" to the Commercial Union policies issued to Avondale deleted the phrase "and caused by accident" from Insuring Agreement I, without a correlative substitution of "caused by occurrence", the policies issued to Avondale are not "occurrence" policies at all, but belong to another, perhaps "hybrid", class of policies. This Court does not agree.

The argument is ingenious but unpersuasive. Even accepting Avondale's interpretation of the endorsement and the effect Avondale claims that interpretation yields, it is clear that paragraph 2 of the "Occurrence Endorsement" substitutes the word "occurrence" for the word "accident" in Insuring Agreement IV, which, with the amendment, reads in relevant part: "This policy applies only to occurrence[s] which occur during the policy period ..."

As correctly pointed out by Commercial Union in its Supplemental Memorandum:

> The third paragraph of the endorsement defines "occurrence":
>
> > " 'Occurrence' means either an accident or a continuous or repeated exposure to conditions which results during the policy period in injury to persons ..."
>
> Thus, substituting the definition of 'occurrence' for the word accident, paragraph IV of the insuring agreement would be considered as stating:
>
> > "This policy applies only to [either an accident or a continuous or repeated exposure to conditions which results during the policy period in injury to persons ...]"

Avondale's reliance on the bold-print title to Insuring Agreement IV avails it nought, for the title itself refers to "Policy Period, Territory" and not simply "Policy, Territory" as Avondale states in its supplemental memorandum. Nor does Endorsement 9, likewise referred to by Avondale, change this result.

■ The Court finds, therefore, that the Avondale policies, like the Southern—Halter policies, are "occurrence policies". They cover plaintiffs' injuries to the extent that plaintiffs can prove that the injuries were real, although undiscovered—i.e., that they occurred during a policy period—irrespective of the times of actual manifestation.

Accordingly, for reasons assigned above as well as those set forth in the Southern—Halter cases, the motion of Commercial Union Insurance Company for summary judgment will be partially granted.

### REASONS FOR CERTIFICATION PURSUANT TO 28 U.S.C. § 1292(b)

■ In the opinion of the Court, the orders to be issued in accordance with the

foregoing involve controlling questions of law as to which there is substantial ground for difference of opinion and an immediate appeal from them will materially advance the ultimate termination of the litigation.

Final resolution of the relevant issues turns on principles of Louisiana law. The highest Court of Louisiana has provided neither definitive answers to, nor jurisprudential guidance on, them. Thus, it is the Court's understanding that counsel intend to request, should the Fifth Circuit Court of Appeals permit interlocutory appeals, the appropriate issues presented be certified by the Court of Appeals to the Louisiana Supreme Court pursuant to La.Rev. Stat. 13:72.1.[2]

Plaintiffs in these cases claim damages due to a progressive lung disease, silicosis. Thus, at first glance, trial should "proceed in regular order", *Wedgeworth v. Fibreboard Corp.*, 706 F.2d 541, at 548 (5th Cir.1983),[3] without the fetters imposed by the interlocutory appeals herein certified. Because the Court realizes that, by taking this action, it embarks upon a highly unusual course, it feels compelled to elaborate on the reasons why certification is necessary.

### Question Number 1

The first controlling question of law for which interlocutory review is sought is:

Does the 1976 Amendment to the Louisiana Workmen's Compensation Act, La. Rev.Stat. 23:1032, bar progressive disease-based negligence actions against an employer's executive officers where the alleged negligent acts of the executive officers predate, but the diagnosis of the disease postdates, the Amendment's effective date? If so, to what extent may such actions be maintained, and, if so maintained, what duties were owed to the employees by the executive officers, and what defenses are they entitled to advance?

The existence of substantial ground for difference of opinion as to this question is illustrated by this Court's own history of ruling on it. In its original opinion issued April 15, 1983, the Court held that the law in existence when plaintiff's cause of action accrued for prescriptive purposes determined the substantive rights of the plaintiff to recover against the executive officers for their negligent acts which predated the effective date of the 1976 Amendments. The Louisiana State Court opinion relied upon by the Court in so ruling has been granted rehearing by the Louisiana Fourth Circuit Court of Appeal, *Quick v. Murphy Oil Co.*, Civ. No. 13258 (La.App.1982), *reh'g granted* March 9, 1983. As of this date, the Louisiana Fourth Circuit Court of Appeal has not resolved the issue. In any event, recourse to the Louisiana Supreme Court is inevitable.

At the same time, serious constitutional questions permeate the application of the Amendment to allegedly negligent acts which predate its effective date. These questions are only magnified and complicated when considered with the nature of the development of this disease. In reversing its position, this Court now has followed what it considers to be the logical extension of rules the Louisiana Courts have developed in cases involving single tortious incidents. *See, Green v. Liberty Mutual Insurance Co., supra.*

While both approaches can be rationalized, they remain diametrically opposed. Only one can be used at trial, and the Court lacks guidance on the correct choice. The futility of proceeding toward a jury trial under such circumstances is obvious, as discussed more fully hereinafter.

---

**2.** This Court believes its plea for the "dual certification" sought in this case presents an extraordinary opportunity, as well as a compelling need, for the exercise of what former Chief Judge John R. Brown has characterized as "federalism in action", *Certification—Federalism in Action,* 7 Cum.L.Rev. 455 (1977), thus avoiding the need for this federal judge to "... trade his judicial robes for the garb of a prophet".

**3.** "The grim reaper has called while judgment waits." *Wedgeworth, supra,* at 545.

Therefore, the Court concludes that there is substantial ground for difference of opinion on this issue.

*Question No. 2*

The second certified question as viewed by this Court for which interlocutory review is sought is:

Whether the insurance policies of Commercial Union Insurance Company, issued to the respective employers, cover either or both negligent and intentional acts of executive officers of such respective employers which give rise to claims founded upon progressive lung disease of employees, when the injury occurred during the policy period, but the disease was not manifested until after the policy expired. If so, to what extent do the policies afford coverage?

While this Court has held that the policy terms provide coverage for negligent acts only to the extent that an injurious result can be established during the policy period, there remains a persuasive argument that the terms prohibit such a result to the extent that *Porter* can be interpreted to set forth a general rule to the contrary. The jurisprudence being generated in other jurisdictions applying general rules of contract interpretation to identical policy terms have yielded what appears to be an exception to the *Porter* approach.

The Court adopts what it considers to be the existing rule in Louisiana as to such an "occurrence" provision. *Oceanonics, Inc., supra.* However, to date, no Louisiana Court has ruled definitively on the effect of the provision in a progressive disease context. The possible variation as to its application in such context is real, and must be determined before trial can be worthwhile.

This Court also has ruled that the policy does not afford coverage for intentional tortious acts of the executive officers except to the extent vicarious liability for intentional acts may be imposed. There is

no definitive Louisiana Court ruling on these provisions.

For these reasons, the Court concludes that there is substantial ground for difference of opinion on this issue

*Immediate Appeal Will Materially Advance Ultimate Termination of Litigation*

The justification for certification of the foregoing issues in the Avondale cases is clear: without their resolution, trial of those demands leads all involved into a yet-trackless thicket of unresolved Louisiana law issues.

In the Southern—Halter cases, although the two issues for which interlocutory appeals are sought arise in the context of third party claims against executive officers, identical hazards are present. The reason for non-joinder of executive officers as direct parties defendant in these cases is obvious; citizenship is not diverse.

While trial strategy must take the rules of diversity jurisdiction into account, it must not become a Siren song, luring the Court and the parties onto the jagged reefs of error.

Nor does separation offer a safe harbor.

While the issues certified in the diversity-based cases might *prima facie* seem to involve only third party claims, which could be separated for trial from the principal claims under Fed.R.Civ.P. 42(b), their edges cut much deeper.

The Court doubts whether such separation would be fair to the parties. Fed.R. Civ.P. 14(a) permits third party defendants to assert defenses against the plaintiffs. This could not be done in a separate trial; third party defendant executive officers would be unable to minimize the possible damages which plaintiffs might recover for which third party plaintiffs claim indemnity. *Lusk v. Penzoil*, 56 F.R.D. 645 (1972).[4]

---

**4.** There is a serious question whether such separation is appropriate in those classes of these cases involving third party claims against executive officers. There, the principal demands are exerted against defendant safety appliance manufacturers. Since

"... the duty of the executive officers to provide adequate safety devices is a non-delega-

Should separate trials nevertheless be ordered, and should defendants succeed in their defenses, plaintiffs would still be entitled to proceed against the third party defendants in another cause, with the attendant duplication of evidence and expenditure of judicial time, *Cox v. E.I. duPont de Nemours and Co.*, 39 F.R.D. 56 (1965). Since essentially the entire case would have to be retried on the third party claims, any recovery on the indemnity claims would be delayed. *See Cox, id.*

Rule 42(b) separation of principal and third party issues would be available, if applicable at all, only in the diversity-based cases, that is, the Southern—Halter group. The pendent jurisdiction cases (the Avondale cases) all present the two critical issues as principal demands against executive officer direct defendants. There is no viable separation option available as to these cases.

It is clear that even in a third party context, the issues of alleged executive officer fault and the availability of insurance coverage for the officers' liability, as well as the time frame within which such fault may be claimed as either defenses or as bases for indemnity, concern not only the principal defendants, in their capacities as third party plaintiffs, but also weigh heavily in the principal claims. Under the Louisiana duty-risk analysis in cases of negligence based fault, the scope of any duty on the part of the respective executive officers is critical;[5] the time frame within which any such duty may have been extant when advanced by defendants as either sole or contributing cause of plaintiffs' alleged damages is likewise crucially important to properly charging a jury. Appropriate evidentiary rulings during the course of trial turn on the respective rights of the parties.

The characterization of witnesses as friendly or adverse, the number of peremptory challenges afforded the respective parties, and the manner and treatment of deposition testimony, all require proper application of the duty-risk analysis to each party and to the claims and/or defenses of each.

It obviously would be easy to summarily sweep aside such concerns, simply separate the third party claims, and where possible call the plaintiffs' cases to trial. This course is *prima facie* attractive, considering particularly the dire circumstances in which many of the plaintiffs now find themselves. But closer analysis of the results which this would produce counsels otherwise.

Immediate trial of even these plaintiffs' claims would not assure a prevailing claimant of relief. Considering the magnitude and extent of the unresolved legal issues, it requires no judicial Nostradamus to predict that appeals are bound to follow. Indeed, if the plaintiffs' claims in the pure diversity-based cases were separated from third party and/or cross claims, the Court, having ordered such separation under Rule 42(b), would be hard pressed not to likewise grant "multiple claim" judgment, pursuant to Fed.R.Civ.P. 54(b), which judgment opens the way for an almost certain appeal. On the other hand, taking these cases to trial *in toto* guarantees appeals and the real probability of additional trials, considering the uncertainty of applicable principles of Louisiana law. Either course offers the prospect of yet additional delay, enormous cost to the parties, probable prejudice due to the inevitable loss of witnesses, and immeasurable dissipation of judicial resources. There would certainly be delay in the receipt of any mandated award.

---

ble duty, and if it is proved at a trial on the merits that the safety devices were defectively designed or manufactured, then the executive officers will be solidarily liable with the manufacturers", *Wilson v. Hartzman, supra,* at 207,

fundamental fairness would require that the executive officer-parties be before the Court when the plaintiffs' claims against the manufacturers are tried.

**5.** The "... very interesting questions of whether the executive officers owed a duty not to expose or continue to expose [an employee] to the deleterious work environment, and whether [an employee] consented to and assumed the risk of such exposure, which was perhaps a danger inherent in the occupation" were not reached in *Wilson v. Hartzman, supra* at 206 n. 2, and remain unresolved in Louisiana.

Under none of the foregoing scenarios would a suffering plaintiff, who might be entitled to a damage award, be accommodated; the interests of other parties would likewise be seriously affected, if not gravely prejudiced. Crudely put, unless the unresolved issues certified by this Court in this proceeding are promptly addressed and resolved, many awards which may ultimately be found to be due will almost certainly augment estates instead of compensating victims. Courts possess no powers to stay these kinds of executions. All we may do is attempt to devise procedures to expeditiously resolve vexing issues in an effort to whittle away at the passage of time—to afford some possibility for hope, against what otherwise appears to be an almost certainty of delay-induced despair.

This Court has been involved with similar environmentally-generated disease cases for nearly four years. Indeed, hundreds of such cases appear on the dockets of the Eastern District of Louisiana; 330 have been temporarily allotted to this section of the Court for pre-trial handling, including the 57 cases consolidated herein, and the numbers increase daily. Many have been pending for several years. They have been long delayed with motions, counter-motions and argument. Yet in almost every instance, the delays have been the products of uncertainty—of inability to recommend viable courses of action to client-parties, because of a paucity of reliable legal bases to formulate an opinion and a trial strategy. The parties, and the Court, are wandering in a legal environment, without landmark, blazing our own trail as we proceed. This is no novel experience for any trial court and, normally, it would be simply regarded as a hazard of the profession. But unusual companions have joined in this journey: impending, inexorable death, constantly mounting damages and multitudinous varieties of claims. They have produced not simply a small band of those who seek the truth of the law, but legions of lawyers, representing hosts of parties, whose footprints mark the hallways of our courts. Their handiworks clog our dockets, and dam the flow of justice sought by countless others, with yet other claims. The backwaters threaten to inundate our entire system.

For these reasons, this Court has invoked the discretion granted it by law and has certified these issues for appeal. If the appeal is accepted, the Court expects counsel to promptly request certification of these issues to the Supreme Court of Louisiana.

Hopefully, the Court of Appeals will agree,[6] and the governing principles of law will be made more certain. "The legal principles involved are unsettled and far reaching ... a powerful mechanism for avoiding unnecessary Erie guesses—certification—exists." *Thompson, supra,* at 584. With increased certainty comes the probability of expeditious, final resolution of the plaintiffs' claims, by trial or by settlement. Either alternative would more easily be achieved, and more certainly pursued, if counsel, the parties and the Court had adequate guideposts. Without them, none can fairly chart a course.

The Court will therefore order that no pre-trial conference or trial dates be set in these matters pending action by the Fifth Circuit Court of Appeals. Implementing orders will be entered in accordance with this opinion.

---

**6.** Judge Goldberg, although in dissent, has cautioned against "writing upon the wind" and counsels, instead, that the "chief meteorologists" be consulted. *Thompson v. Johns-Manville Corp., et al., supra.*