Julius DUCRE, et al.,
Plaintiffs-Appellees,

v.

The EXECUTIVE OFFICERS OF
HALTER MARINE, INC., et al.,
Defendants-Appellants.

No. 83–3784.

United States Court of Appeals,
Fifth Circuit.

Jan. 25, 1985.

Rehearing and Rehearing En Banc
Denied March 14, 1985.

Wayne H. Carlton, Jr., Orlando G. Bendana, New Orleans, La., for Julius Ducre.

Frank J. Peragine, Daniel J. Caruso, New Orleans, La., for Am. Optical.

Charles Hanemann, Houma, La., for Minnesota Mining.

Craig R. Nelson, New Orleans, La., for Clemco.

Robert M. Johnston, Gary M. Zwain, New Orleans, La., for Pulmosan.

James L. Selman, II, Madeleine Fischer, New Orleans, La., for Mine Safety/Travelers & Ina.

Daniel Frazier, Jr., Marrero, La., for Linda Richardson Johnson.

Lawrence J. Ernst, New Orleans, La., for Pulmosan Safety.

Donald A. Hoffman, Gerolyn P. Roussel, New Orleans, La., for Mine Safety.

Vance E. Ellefson, New Orleans, La., for Executive Officers-Halter Marine.

Thomas E. Loehn, Cynthia P. Conroy, New Orleans, La., for Commercial Union.

Sondra A. Cheek, Bogalusa, La., for Exec. Officers So. Shipbuilding, etc.

Joseph M. Bruno, New Orleans, La., for Avondale plaintiffs.

Charles M. Steen, New Orleans, La., for D.A. Krenz, et al.

William S. Marshall, Jr., Alan Dean Weinberger, New Orleans, La., for Highlands Ins. & Exec. Officers Avondale.

Andrew L. Plauche, Jr., New Orleans, La., Stewart Dalzell, Thomas J. Leach, Philadelphia, Pa., for Am. Motorists Ins.

Leon A. Aucoin, Metairie, La., for intervenor-Continental Ins.

S. Gene Fendler, Robert E. Holden, William W. Pugh, New Orleans, La., for Krenz, et al.

Before THORNBERRY, GARWOOD, and HILL, Circuit Judges.

ROBERT MADDEN HILL, Circuit Judge:

This appeal is before us on certified questions [1] which arise from the district court's orders partially granting and partially denying two principal summary judgment motions.[2] More than forty employees of various ship-building companies seek damages resulting from their contraction of silicosis, a progressive lung disease, somewhat similar in origin and development to asbestosis. Involved as defendants, either directly or on third party demand, are the employers' executive officers, their insurers, and the manufacturers of safety equipment used by the employees. The actions were brought by the silicosis victims in various federal courts but were consolidated in the court of Judge George Arceneaux, in the Eastern District of Louisiana, because they involved similar issues. However, two distinct procedural structures are present in the consolidated cases; consequently, some issues are peculiar to one or the other and some are common to both.

## The Southern-Halter Cases

After being told that he had contracted silicosis, Julius Ducre, a former employee of Southern Shipbuilding Corporation (Southern) and Halter Marine, Inc. (Halter) brought an action against Mine Safety Appliances Company, Pulmosan Safety Equipment Corporation, Clemco Industries, and Minnesota Mining and Manufacturing Com-

---

1. See 28 U.S.C. § 1292(b).

2. *Ducre v. Mine Safety Appliances,* 573 F.Supp. 388 (E.D.La.1983).

pany, the manufacturers of respiration safety equipment Ducre allegedly used during his tenure as a sandblaster in the shipyards of Southern and Halter. Inhalation of silica dust while sandblasting allegedly caused him to contract silicosis. Ducre alleged that he inhaled excessive and dangerous amounts of silica dust due to the manufacturers' acts in negligently manufacturing the safety equipment, in placing it in commerce when it was defective and unreasonably dangerous, and in failing to warn of the dangers associated with using the equipment. The manufacturers then brought third party actions against the executive officers of Southern and Halter, alleging that they were negligent in failing to protect Ducre from exposure to silica dust and in failing to properly instruct Ducre in the use of the safety equipment, and that they intentionally caused Ducre's medical disorders by exposing him to silica dust, knowing that this was substantially certain to cause lung damage. On these allegations the manufacturers founded their claims for indemnity and contribution against the executive officers in the event the manufacturers are cast in judgment. Commercial Union Insurance Company (Commercial Union) was named as a third party defendant due to its position as Southern's insurer.[3]

### The Avondale Cases

In the Avondale cases, more than 40 silicosis victims[4], current and former employees of Avondale Shipyards, Inc. (Avondale), brought actions against the executive officers of Avondale for negligent and intentional acts and omissions causing the victims to inhale excessive amounts of silica dust while sandblasting in the Avondale shipyards. Commercial Union, Avondale's only insurer during the years the victims were exposed to silica dust, was joined either as a direct defendant by the victims or as a cross-defendant by the executive officers.

### The Motions

The Southern and Halter executive officers sought summary judgment against the equipment manufacturers on three grounds. First, they asserted an affirmative defense based on the 1976 amendment to a provision of the Louisiana Workmen's Compensation Act, La.Rev.Stat.Ann. § 23:1032 (West Supp.1984), *as amended by* Acts of 1976, No. 147, § 1.[5] The Southern and Halter executive officers contended that § 23:1032 foreclosed third party indemnity and contribution actions against them where the third party plaintiff has been sued by the victims only after the effective date of the amendment. Second, the executive officers contended that the manufacturers' third party complaints failed to state claims for indemnity under Louisiana law. Finally, they contended that the manufacturers failed to state claims in intentional tort, on which ground they moved the district court to dismiss the third party actions.

Subsequently, the Avondale executive officers filed a motion to dismiss or, in the alternative, for partial summary judgment in the actions against them. The motion for summary judgment adopted the argument of the Southern and Halter executive officers based on § 23:1032. In the 12(b)(6) motion to dismiss, the Avondale executive officers argued, similarly to the Southern and Halter executive officers, that the victims' complaints failed to allege facts sufficient to state claims in intentional tort.

---

3. Eleven similar actions, filed against Southern and/or Halter in other courts, were consolidated with Ducre's claim.

4. We are informed that of the more than 40 consolidated cases originally filed against the Avondale executive officers, all but one have been settled. However, the executive officers have reserved their right to recover against Commercial Union the costs of defending the settled actions. Brief of Appellants D.A. Krenz, William Koch, *et al* at 4 n. 2.

5. Pertinent language of the 1976 Amendment is set out in part I. A., *infra.*

The district court first granted summary judgment as to the third party claims against the Halter executive officers based on § 23:1032. The court, however, denied summary judgment finding that the third party complaints stated claims in intentional tort.[6]

After consolidating the Avondale with the Southern-Halter cases in September 1983, the district court reconsidered its earlier rulings, vacated them insofar as they dealt with the liability of the executive officers of Southern and Halter under § 23:1032 and issued a second opinion. *Ducre*, 573 F.Supp. at 388, 392. Concerning executive officer liability, the court reversed itself and partially granted summary judgment for the executive officers of Southern, Halter and Avondale.[7] *Ducre*, 573 F.Supp. at 392. The court left intact its original ruling on the intentional tort claims in the Southern-Halter cases and, denied the Avondale executive officers' Rule 12(b)(6) motion to dismiss, presumably on similar grounds. For the reasons set forth in parts I. and II., below, we reverse the partial grant of summary judgment as to negligence liability and affirm the denial of summary judgment as to intentional tort liability.

6. When the district court entered its ruling, it had before it only the Halter executive officers' motion in the Ducre action. Later, the court extended its ruling to the Southern executive officers' motion in the same action.

7. The district court apparently assumed that its new ruling disposed of the third party complaints against the Southern and Halter executive officers by the equipment manufacturers, as well as the direct actions against the Avondale executive officers. We disagree for the reasons set forth in part II., below.

8. Commercial Union also sought summary judgment under a provision in the policies which excludes coverage of injury caused by acts "committed by or at the direction of the insured." *Ducre*, 573 F.Supp. at 393. The district court held that the exclusion would not apply to any vicarious liability which might be incurred by the executive officers for the intentional acts of others and that, therefore, the policies would provide coverage in that event. *Id.*, at 394. Commercial Union having failed to raise this issue on appeal, we decline to review at this time the district court's denial of summary judg-

In all cases Commercial Union sought summary judgment, contending that the terms of its policies with Southern and Avondale excluded indemnity and defense coverage for any liability incurred by the executive officers for both negligent and intentional acts.[8] It argued that the policies' "occurrence endorsements" excluded coverage where silicosis manifests itself in the victim after the policy term has expired. In its second opinion, the district court partially granted summary judgment as to coverage under the "occurrence endorsement", rejecting Commercial Union's theory of interpretation. *Ducre*, 573 F.Supp. at 393–94. For the reasons set forth in part III., *infra*, we reverse the partial grant of summary judgment as to coverage under the "occurrence endorsement."

Finally, in its second opinion, the district court certified the two main issues, viz., the executive officers' liability under § 23:1032 and Commercial Union's liability under its policies, for interlocutory appeal under 28 U.S.C. § 1292(b),[9] *see Ducre*, 573 F.Supp. at 394–98, and several parties petitioned this court for leave to take interlocutory appeals. We granted the petitions and docketed this appeal.

ment on that ground. *See McGee v. Estelle*, 722 F.2d 1206, 1213 n. 23 (5th Cir.1984) where we observed that "we have repeatedly refused to examine issues not raised in the appellate briefs absent the possibility of injustice so grave as to warrant disregard of usual procedural rules." We follow this rule of prudence with even less trepidation than usual since our jurisdiction is based on 28 U.S.C. § 1292(b) and the district court's denial of summary judgment is interlocutory in nature.

9. 28 U.S.C. § 1292(b) states, in part:
When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order ....

## I. THE AVONDALE CASES: EXECUTIVE OFFICER LIABILITY

### A. *Negligence*

Until 1976, Louisiana permitted injured workers to sue the officers of their corporate employers in tort, in addition to recovering under the Louisiana Workmen's Compensation Act. La.Rev.Stat.Ann. § 23:1032 (West 1964); *see Canter v. Koehring Co.,* 283 So.2d 716 (La.1973). The corporate employer itself, however, was immune to similar suits. *Id.* In 1976, the Louisiana legislature amended the Workmen's Compensation Act so as to preclude such suits against executive officers, except to the extent they are based on intentional acts. The amendment took effect on October 1, 1976, and provides in part, as follows:

> The rights and remedies herein granted to an employee or his dependent on account of an injury, or compensable sickness or disease for which he is entitled to compensation under this Chapter, shall be exclusive of all other rights and remedies of such employee, his personal representatives, dependents, or relations, against his employer, or any principal or any officer, director, stockholder, partner or employee of such employer or principal, for said injury, or compensable sickness or disease....
>
> Nothing in this Chapter shall affect the liability of the employer, or any officer, director, stockholder, partner or employee of such employer or principal to a fine or penalty under any other statute or the liability, civil or criminal, resulting from an intentional act.

La.Rev.Stat.Ann. § 23:1032 (West Supp. 1984), *as amended by* Acts of 1976, No. 147, § 1; *see also Bazley v. Tortorich,* 397 So.2d 475 (La.1981).

In the Avondale cases, all the silicosis victims were exposed, in varying degrees and for varying periods of time, to silica dust before the effective date of the amendment. However, the amendment had taken effect before any of the victims had been diagnosed as having silicosis. The filing of these actions, of course, followed the diagnoses.[10] The Avondale executive officers filed motions to dismiss and motions for summary judgment claiming that the 1976 amendment bars the victims' actions. The issue posed by the timing of these actions is whether the 1976 amendment applies to bar suit by an employee who was exposed to a damaging agent before, but whose disease has only manifested itself and been diagnosed after, the effective date of the amendment.[11] All parties agree, however, that the issue has already been posed to the Louisiana Supreme Court and decided in *Owens v. Martin,* 449 So.2d 448 (La.1984).[12]

In *Owens,* the surviving widow of a deceased victim of asbestosis, sued the executive officers of the victim's corporate employer, asserting the same cause of action the victim would have had if he had survived.[13] The victim was exposed to asbestos before October 1976, but died of asbestosis in June 1980. The court's opinion fails to mention the date of diagnosis. The executive officers filed a motion for summary judgment, arguing that § 23:1032 barred the suit. Plaintiff argued that the amendment could not be applied retroactively and that her cause of action arose

---

**10.** The issue is not raised in, nor does our holding apply to, cases which were consolidated and in which diagnosis took place before the effective date of the amendment. In such cases, if they exist, there is no bar to the actions against the executive officers.

**11.** In the Southern-Halter cases, the issue is raised only indirectly by the third party demands of the equipment manufacturers against the Southern and Halter executive officers. Although the following discussion is relevant to those cases, it is not dispositive and further

discussion, namely of principles of Louisiana contribution and indemnity law, is necessary. *See infra* part II. B. To the extent the district court's opinion indicates otherwise, it is incorrect.

**12.** *Owens* was decided on April 2, 1984, after Judge Arceneaux's second opinion but before oral argument was presented in this appeal.

**13.** *See Guidry v. Theriot,* 377 So.2d 319, 322–25 (La.1979).

prior to October 1976. Therefore, she argued, the amendment could not bar her suit against the executive officers.

Apparently, but not expressly, taking as given that the 1976 amendment is not to be applied retroactively, the court focused on the question of when plaintiff's cause of action arose. Citing precedent which dealt with "liberative prescription,"[14] the court observed that, along with a negligent act and causation, damages are essential to the negligence action. *Owens,* 449 So.2d at 451. The court stated, as a general proposition, that "[s]ince prescription cannot commence until damages are sustained, a cause of action does not accrue until that time." *Id.* The court, however, offered little guidance in the critical inquiry of when, in the latent disease context, damages are sustained. It merely noted that the case was before it only on the issue of whether the plaintiff's petition stated a cause of action in light of the affirmative defense asserted by the executive officers. *Id.* at 452. The court noted that in Louisiana a complaint states a cause of action "unless the allegations of the petition exclude every reasonable hypothesis other than the premise upon which the defense is based." *Id.* (citing *Haskins v. Clary,* 346 So.2d 193, 195 (La.1977)). The court then held that the petition "[did] not exclude the possibility that Mr. Owens began to suffer damage prior to October 1, 1976" and, therefore, "[i]t is impossible to say when damages occurred sufficient to give rise to a cause of action without additional fact finding below." *Owens,* 449 So.2d at 452.

Although the *Owens* court thought the "contraction theory" was "more realistic" than the exposure theory and the manifestation theory,[15] the court explicitly refused to hold that the date the victim contracted the disease is the date sufficient damages are sustained to give rise to a cause of action. In reserving the issue the *Owens*

court quoted, in a footnote, its prior denial of writs in *Quick v. Murphy,* 446 So.2d 775 (La.App.1984), in which the Louisiana Court of Appeal held that the cause of action arose at the time of "contraction." *Owens,* 449 So.2d at 452 n. 5. In *Quick,* the Supreme Court had written,

> We decline, however, to express an opinion at this stage of the proceeding as to whether the date of "contraction" can be established with sufficient legal certainty to hold that the cause of action arises at that time. Such a determination necessarily requires expert testimony explaining how such time, or period of time, can be established. Until such a record is before the court, the issue cannot be fairly resolved.

*Quick v. Murphy,* 447 So.2d 1074 (La. 1984). Although it carries the qualified commendation of the highest court of Louisiana, the contraction theory is not the law of Louisiana on this issue.

 Thus, we are asked to decide an issue the guiding principle of which is, by the conscious act and will of the Louisiana Supreme Court, in a state of flux. Duty bound as we are to apply the law of Louisiana and not knowing when Louisiana law considers a victim of a latent disease to have sustained damages so as to give rise to a cause of action, we can only hold, as the *Owens* court did, that these executive officers are not entitled, at this stage of the litigation, to summary judgment or dismissal on the affirmative defense derived from § 23:1032.

The district court held that the victims could maintain their causes of action only to the extent that they could show "negligent acts [that] resulted in some injury before the effective date of the 1976 Amendment." *Ducre,* 573 F.Supp. at 392. Apparently expanding on this, the court wrote that the parties should "have an opportunity to establish facts sufficient to

---

**14.** The Louisiana equivalent of a statute of limitations.

**15.** The exposure theory holds that the cause of action arises with the first exposure of the victim to the damaging agent. The manifestation

theory holds that the cause of action arises only when the disease manifests itself in symptoms. Both are discussed more fully below. *See infra* part III.

prove a physical abnormality, in and of itself, diagnosable before 1976." *Id.* The court cited no authority for this position nor can we find Louisiana precedent supporting a "diagnosability" standard. To the extent the "diagnosability" standard is identical to the "manifestation" theory, the Louisiana Court of Appeal rejected it and the Supreme Court disapproved it in *Quick.* On this basis, summary judgment in favor of the Avondale executive officers was partially granted. We, therefore, reverse the partial grant of summary judgment, remanding the Avondale cases for further development of the evidence concerning the time when "damages [were] sustained" by the victims, as that phrase is used in *Owens.*

Although *Owens* has not provided sufficient guidance under Louisiana state law for us to further direct the district court on remand, it is appropriate for the federal district judge, well-versed in Louisiana law, to extend the rationale of *Owens* as necessary to resolve the present cases. *See Delducca v. United States Fidelity and Guaranty Co.*, 357 F.2d 204, 205 n. 1 (5th Cir.1966). Any interpretation of state law by a federal court should be an attempt to reach the same result as would be reached by the state courts. *See Oliva v. Pan American Life Insurance Co.*, 448 F.2d 217, 221 (5th Cir.1971).

### B. *Intentional Tort*

In the Avondale cases the victims bring claims against the executive officers for intentional acts causing them injury. In their motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6), filed September 13, 1983, the Avondale executive officers argued that the facts alleged in the complaints were "insufficient under any conceivable set of circumstances to establish" that they intentionally harmed the victims. The district court denied the motion stating that the allegations were sufficient. *Ducre*, 573 F.Supp. at 392. For the reasons set forth in part II. B.2, below, we affirm the denial of the motion to dismiss.

## II. THE SOUTHERN–HALTER CASES: THIRD PARTY CLAIMS

▮ In partially granting the motions for summary judgment of the Southern and Halter executive officers, the district court held that to the extent the victims could demonstrate that the executive officers were responsible "for negligent acts shown to have resulted in some injury before the effective date of the 1976 amendment," the third party claims for contribution and indemnity should stand. *Ducre*, 573 F.Supp. at 392. The court apparently assumed that the 1976 amendment to § 23:1032 fully controlled the Southern-Halter cases as well as the Avondale cases. However, the summary judgment motions of the Southern and Halter executive officers raise issues of Louisiana indemnity and contribution law as well as the question of the applicability of the amendment. Thus, the district court's opinion—and our discussion above—insofar as it relates solely to the issue of the applicability of the amendment, does not completely dispose of the summary judgment motions of the Southern and Halter executive officers.[16]

---

16. For obvious reasons, when the court articulated the certified issues, it failed to include questions concerning indemnity and contribution. *See Ducre,* 573 F.Supp. at 395. Nevertheless, these issues are properly before us. Under § 1292(b), it is not merely the controlling question of law which is certified for appeal; it is the entire *order* entered by the trial court. *Nuclear Engineering Co. v. Scott,* 660 F.2d 241, 246 (7th Cir.1981); *cf. FDIC v. Dye,* 642 F.2d 833, 837 (5th Cir.1981) (*orders,* as opposed to *issues,* other than that certified may not be considered). *See generally* 16 C. Wright and A. Miller, Federal Practice and Procedure § 3929 at 143–45 (1977); Note, Interlocutory Appeals under § 1292(b), 88 Harv.L.Rev. 607, 628–29 (1975). Thus, the appellate court may address all issues material to the order and is not limited to consideration of the "controlling question." *See Bersch v. Drexel Firestone, Inc.,* 519 F.2d 974, 994–5 (2d Cir.1975) (Friendly, J.) (question which could be read into certified controlling issue was within § 1292(b) jurisdiction); *Johnson v. Alldredge,* 488 F.2d 820, 822–23 (3rd Cir.1973) (narrowly drawn certified controlling issue did not prevent court of appeals from addressing broader issues), *cert. denied,* 419 U.S. 882, 95 S.Ct. 148, 42 L.Ed.2d 122 (1974). This is especially so when the issues

In fact, the applicability of the amendment has no bearing on our disposition of the indemnity claims.

### A. The Indemnity Claims

Ducre's complaint against the safety equipment manufacturers alleges negligent manufacture of the equipment, defective manufacture based on strict tort theory, and negligent failure to warn as to uses of the equipment and dangers associated therewith. In their third party complaints against the executive officers, the manufacturers allege negligent failure to provide a safe work environment and adequate safety equipment, negligent failure to instruct in the use of safety equipment provided, and intentional acts causing exposure to damaging substances.[17] By reason of the officers' allegedly negligent and intentional acts, the manufacturers seek indemnity and contribution in the event they are cast in judgment for their own tortious conduct towards the victims.

In these diversity cases Louisiana law governs the substantive issue of whether the manufacturers have the right to be indemnified by the executive officers. *See Joiner v. Diamond M. Drilling Co.,* 688 F.2d 256, 260–61 (5th Cir.1982). In Louisiana the prototypal indemnity action is the surety's demand for reimbursement from the primary debtor for funds paid by the surety to the creditor upon default. *See* La.Civ.Code Ann. art. 3052 (West 1952); *Louisiana Bank & Trust Co., Crowley v. Boutte,* 309 So.2d 274 (La.1975). The duty of the debtor to respond in damages, typically, is founded on the contract wherein it has promised to hold the surety harmless for injury to it caused by the debtor's default. Otherwise, the debtor would be unjustly enriched at the surety's expense. Similar notions are imported into the tort context.

■ Generally, a tortfeasor has no right of indemnity against a cotortfeasor. *Appalachian Corp. v. Brooklyn Cooperage Co.,* 151 La. 41, 91 So. 539, 541 (1922). Rather, his remedy is usually a demand for contribution when he is liable "in solido" with his cotortfeasor. *See* La.Civ.Code Ann. arts. 2091, 2092. The rule of contribution is stated by La.Civ.Code Ann. arts. 2103 and 2104. *See infra* note 25. A refinement of the rule of contribution is offered by La.Civ.Code Ann. art. 2106, the codal source of indemnity:

> If the affair for which the debt has been contracted *in solido,* concern only one of the co-obligors *in solido,* that one is liable for the whole debt towards the other codebtors, who, with regard to him, are considered only as his securities.

(West 1977).

Whether the debt "concern[s] only one of the co-obligors" *in tort* is resolved by determining whether the fault of one tortfeasor is actual and that of the other merely constructive or technical. *Truxillo v. Gentilly Medical Building, Inc.,* 225 So.2d 488, 495 (La.App.1969). The contours of the action for indemnity among tortfeasors were adumbrated by the Louisiana Supreme Court in the leading case of *Appalachian Corp. v. Brooklyn Cooperage Co.* in the following language:

> [W]here ... the actual fault of the proximate cause of injury is attributable to one of the parties and the other is only technically or constructively at fault, from failure or omission to perform some legal duty, the general rule [of contribution] will not apply and indemnity may be had against the one primarily responsible for the act which caused the damage.

91 So. at 541. In such a context, the action for contribution is replaced by the action for indemnity in favor of the tortfeasor who was merely constructively at fault. Scrutiny is thus directed at the nature, not the quantum, of the fault, if any, of the

---

outside the "controlling question" provide grounds for reversal of the entire order. *Murphy v. Heppenstall Co.,* 635 F.2d 233, 235 n. 1 (3rd Cir.1980), *cert. denied,* 454 U.S. 1142, 102 S.Ct. 999, 71 L.Ed.2d 293 (1981).

**17.** The allegations of the four third party plaintiffs are here summarized and synthesized for ease of discussion.

party seeking indemnity. *Id.* If it can be characterized as merely technical or constructive, the action for indemnity may lie. If it is, rather, actual, only contribution is available.

Of course, artificiality and empty formalism often plague the law's attempt to categorize anything so complex and various as human conduct, whether tortious or otherwise. The dangers are most insidious at the margins, however. Happily, in this appeal, we find ourselves comfortably in the core of the categories where the dangers are most remote. There is no foreseeable combination of findings, viewing the allegations of the pleadings and the evidence in the light most favorable to the manufacturers,[18] that could result in the manufacturers' being cast in judgment for mere technical or passive fault.

The rule of *Appalachian* has been applied in numerous contexts but none similar to that before us. For instance, in an action based on vicarious liability an employer has the right of indemnity against its employee when the employer incurs liability, under principles of *respondeat superior*, for the negligence of its employee. *See Truxillo v. Gentilly Medical Building, Inc.*, 225 So.2d at 494–96; and *Lebanc v. Roy Young Inc.*, 308 So.2d 443 (La.App. 1975), *writs denied*, 313 So.2d 240. Another common form of technical or constructive fault, for which indemnity will lie, is that of a building owner who is liable, under La.Civ.Code Ann. arts. 2317 and 2322,[19] for a "vice" in the construction of the building merely because he failed to discover it. As Judge Goldberg wrote, "the classic case of passive negligence occurs only when one joint tortfeasor creates a danger that the other (passive) tortfeasor merely fails to discover or remedy." *Wedlock v. GMMC*, 554 F.2d 240, 243 (5th Cir. 1977) (maritime tort law). Thus, when the building owner has responded in damages to an occupant injured when a defective elevator has malfunctioned, the owner may obtain indemnification against the elevator manufacturer whose negligent construction of the elevator actually caused the injury. *Leaber v. Jolley Elevator Corp.*, 354 So.2d 746 (La.App.1978). Indeed, a similar accident gave rise to *Appalachian* itself, although the indemnitee's liability was based on the general tort duty to provide its employees with a safe place to work[20], rather than on the statutory provisions dealing with construction vices. Similarly, where the thing causing injury is not a building but a defective piece of equipment, the owner or user of the equipment may recover in indemnity against the manufacturer whether the manufacturer is liable in negligence or strict tort. *Carter v. EPSCO*, 681 F.2d 1062, 1066 (5th Cir.1982). These theories of technical fault based on custody of a damaging instrumentality, far from supporting the indemnity claims of the equipment manufacturers here, suggest only a theory of indemnity in favor of the executive officers.

As in the contractual indemnity action, notions of unjust enrichment[21] and of inju-

---

**18.** *See Howard v. United States*, 711 F.2d 729, 733 (5th Cir.1983).

**19.** Art. 2317 provides, in part, that, "[w]e are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act ... of the things which we have in our custody." (West 1979).

Art. 2322 provides, in part, that, "[t]he owner of a building is answerable for the damage occasioned by its ruin ... when it is the result of a vice in its original construction." (West 1979).

**20.** *Appalachian*, 91 So. at 541. We observe that the similarity of the duty placed on the indemnitee in *Appalachian* with that placed on the executive officers here would offer support for an

indemnity claim, not by the equipment manufacturers, but by the executive officers.

**21.** The Louisiana Supreme Court has written that the civil law basis of the indemnity remedy, at least for purposes of prescription, is the principle that "forbids enrichment [of one] at the expense of another." *Minyard v. Curtis Products, Inc.*, 251 La. 624, 205 So.2d 422, 432 (1967) (citation omitted).

*See also, Truxillo*, 225 So.2d at 495 where the court, citing *Minyard*, wrote that whether one tortfeasor's fault is active and that of the other merely constructive, depends upon "whether some basis exists to conclude that treating both co-debtors as equally responsible ... would constitute an *unjust* enrichment of one at the expense of the other." (emphasis in original).

ry to the indemnitee (in the form of an obligation to pay a judgment to the original plaintiff) by the fault of the indemnitor (whose negligence actually injured the original plaintiff) [22] provide a theoretical foundation for the tort indemnity action. When these notions are not operating, the fault of the party seeking indemnity is often said to be "actual" or "active" and indemnity is not permitted. Thus, in *Hunt v. City Stores*, 387 So.2d 585 (La.1980), the owner of a department store could not be indemnified by the manufacturer of a defective elevator which caused injury to a patron of the store because the store owner was, itself, actively negligent in failing to warn of a danger of which it knew. The store owner's liability was based, not on mere custody of the damaging instrumentality and failure to discover its defects, as in *Appalachian* and *Carter*, but on its own active negligence committed after it knew of the defects. As this court has written, indemnity is available only "where the actual fault is *attributed* [to another] .... It is never applicable where both parties are actually in the wrong."[23]

In the appeal before us, the parties seeking indemnification (the safety equipment manufacturers) have been charged with negligent manufacture, defective manufacture based on strict tort, and negligent failure to warn. No Louisiana court has seen fit to characterize such or similar fault as merely technical or constructive. On the other hand, two courts, one applying Louisiana law, the other applying maritime tort law, have characterized identical allegations as asserting active or actual fault.

In *Mosbroker v. E.D. Bullard Co.*, CA No. 81–1569 (W.D.La. July 11, 1984) (unpublished), in a procedural context identical with the one before us, the court dismissed the respiratory equipment manufacturer's third party indemnity claim against the silicosis victim's executive officers, finding that any form of fault underlying the manufacturer's liability, whether sounding in negligence or in "products liability," would be active and not merely technical or constructive. *Id.* The district court cited *White v. Johns-Manville Corp.*, 662 F.2d 243 (4th Cir.1981), in support of its holding.

In *White*, asbestosis victims sued Johns-Manville and other suppliers of asbestos products on theories of negligence, breach of implied warranty, and strict liability. Johns-Manville then filed a third-party claim for indemnity against the victims' employers. The court concluded that the indemnity claim was "without merit under the most favorable possible interpretation of its underlying factual and legal theories as advanced by the manufacturers." *White*, 662 F.2d at 249. Applying maritime tort law, the court held that the manufacturer's liability, if any, would be premised on "active, primary, or original fault" rather than mere "passive, secondary or implied fault."[24] *Id.* (citing *Tri-State Oil Tool Industries, Inc. v. Delta Marine Drilling Co.*, 410 F.2d 178 (5th Cir.1969)). Moreover, Johns-Manville's claims against the employers could be read only as charging either concurrent fault, giving rise only

---

**22.** *See Sutton v. Champagne*, 141 La. 469, 75 So. 209, 211 (1917) (indemnitee "has recourse over against the person who by his act brought the responsibility [of paying damages to the injured party] upon [the indemnitee]."); and *Truxillo*, 225 So.2d at 496, where the court said that, in determining that indemnity is available, "we must say ... that the [indemnitor's] negligence caused injury to the [indemnitee] (who was only liable on theoretical grounds for damages actually inflicted by the [indemnitor] )." Therefore, the court concluded, "[the indemnitor] ... was obliged towards [the indemnitee], impliedly, to so perform its contract as not to expose [the indemnitee] to liability to third persons." *Id.*

**23.** *United Gas Corp. v. Guillory*, 206 F.2d 49, 53 (5th Cir.1953) (gas company, which negligently permitted natural gas to seep into underground construction causing explosion and injury to employees of construction company, had no right of indemnity against construction company).

**24.** As classic technical fault situations, the court cited, and distinguished, cases similar to those we have extracted from Louisiana law. *White*, 662 F.2d at 249. *See supra* text accompanying notes 18–20.

to an action for contribution, or fault constituting an intervening or superseding cause of the victims' suffering. *White*, 662 F.2d at 250. Respecting the latter point, the court reasoned that Johns-Manville's allegations that the employer failed to provide its employees with "a safe place to work" and "to warn them of the dangers of asbestos", allegations almost identical to those found in the third party claims before us, invoked absolute defenses to the victims' claims against the manufacturers. *Id.* To this extent, the allegations negated the fundamental predicate of the indemnity claim, namely, the establishment of liability, in the first instance, against the would-be indemnitee. Given the nature of (a) the claims levied against Johns-Manville and (b) Johns-Manville's claims against the employers, the court in *White* concluded that Johns-Manville had not stated claims for indemnity. *Id.*

■ We find the reasoning of the Fourth Circuit in *White* convincing and congruent with the law of Louisiana.[25] We therefore hold that the manufacturers' claims for indemnity based on the negligent and intentional acts of the executive officers are insupportable in Louisiana law and should not stand. The district court erred in failing to fully grant summary judgment for the executive officers on the indemnity claims.

### B. *The Contribution Claims*

In seeking summary judgment as to the manufacturers' claims for contribution, the Southern and Halter executive officers ar-

gue that such claims are barred by the coalescence of Louisiana principles of contribution with the 1976 amendment to § 23:1032. Of course, this argument only applies to the negligence claims since § 23:1032 exempts actions in intentional tort from its prohibition. However, as to the intentional tort claims, the executive officers argue that the third party allegations as to the state of mind requisite to intentional tort fail to state a claim on which relief can be granted. We discuss each of these contentions in turn.

### 1. *Contribution for Negligence*

In the Southern-Halter cases, as well as in the Avondale cases, the district court held that "the executive officers can be held liable, at a minimum, for negligent acts shown to have resulted in some injury before the effective date of the 1976 Amendment." *Ducre*, 573 F.Supp. at 392. Apparently, the court thought this holding applied to the manufacturers' contribution claims against the executive officers as well as to the direct claims of the victims. Accordingly, the court partially granted summary judgment for the Southern and Halter executive officers, presumably, to the extent the victims could meet the standard set forth. We disagree with the court's reasoning as applied to the Southern-Halter cases because it ignored relevant principles of Louisiana contribution law.

■ It is firmly established that a tortfeasor's cause of action for contribution against its cotortfeasor, where they are

25. This court has noted before the congruence of the indemnity principles of maritime tort law with those of Louisiana tort law. *See, e.g., Halliburton Co. v. Norton Drilling Co.*, 302 F.2d 431, 437 (5th Cir.1962), *adhered to*, 313 F.2d 380 (1963). In denying a claim for indemnity under maritime tort because the would-be indemnitee was charged with active rather than passive fault, this court commented, "the same result we have reached would follow if the law of Louisiana were applied." *Id.* (citing *United Gas Corp. v. Guillory*, 206 F.2d 49 (5th Cir.1953)); *see also, Avondale Shipyards, Inc. v. Vessel Thomas E. Cuffe*, 434 F.Supp. 920, 927 (E.D.La.1977) (Ru-

bin, J.) ("If Louisiana law governed the issue of tort indemnity, such indemnity would be available only in circumstances similar to those required under the *Tri-State* doctrine.") (citing *Appalachian, supra*). *Tri-State* is a leading maritime tort indemnity case in this circuit and was cited in *White, supra*.

*White's* holding on the issue of admiralty jurisdiction has been extensively criticized. *See e.g., Lowe v. Ingalls Shipbuilding*, 723 F.2d 1173, 1187–89 (5th Cir.1984). Those criticisms, however, have no bearing on those aspects of *White* on which we rely.

liable *in solido*,[26] arises, not when the tort occurs but when judicial demand by the injured party is made upon one of the co-tortfeasors. This principle was enunciated in *Brown v. New Amsterdam Cas. Co.*, 243 La. 271, 142 So.2d 796 (1962), in a setting precisely the converse of the one presented to us.

Before January 1, 1961, the jurisprudence construing La.Civ.Code Ann. art. 2103[27] prohibited a defendant from maintaining a contribution action against his cotortfeasor unless both had already been cast in judgment *in solido* by the injured party's action for damages. *Brown*, 142 So.2d at 797–98. Article 2103 was amended, effective January 1, 1961, to permit such an action.[28] *Brown* arose when, after an automobile collision, one of the injured drivers, Brown, sued the employer of the other driver for damages. Brown filed his action after January 1, 1961, although the injury occurred in the Fall of 1960. The defendant employer filed a third party complaint against Brown's insurer for contribution, claiming Brown was a joint tortfeasor. The *Brown* court held that the post-amendment rule applied to the contribution claim because the defendant's cause of action for contribution arose on the date "judicial demand" was made on him, that is, on the date Brown filed suit against him. The court wrote that

> the rights and obligations as between the joint wrongdoers do not ... arise [at the time the injured party's right arises], because they are not created by virtue of the commission of the tort and of the

**26.** The codal sources of the contribution action are found in the following articles of the Louisiana Civil Code:

> There is an obligation *in solido* on the part of the debtors, when they are all obliged to the same thing, so that each may be compelled for the whole, and when the payment which is made by one of them, exonerates the others toward the creditor.

La.Civ.Code Ann. art. 2091 (West 1977).

> When two or more debtors are liable in solido, whether the obligation arises from a contract, a quasi-contract, an offense, or a quasi-offense, the debt shall be divided between them.... If the obligation arises from an offense or a quasi-offense, it shall be divided in proportion to each debtor's fault.
>
> A defendant who is sued on an obligation which, if it exists, is solidary may seek to enforce contribution, if he is cast, against his solidary co-debtor by making him a third party defendant in the suit, as provided in Article 1111 through 1116 of the Code of Civil Procedure, whether or not the third party defendant was sued by the plaintiff initially, and whether the defendant seeking to enforce contribution if he is cast admits or denies liability on the obligation sued on by the plaintiff.

*Id.* art. 2103 (West Supp.1984), *as amended by* Acts of 1979, No. 431, § 1, eff. Aug. 1, 1980.

> If one of the codebtors *in solido* pays the whole debt, he can claim from the others no more than the part and portion of each.

(West 1977) *Id.* art. 2104.

> He who causes another person to do an unlawful act, or assists or encourages in the commission of it, is answerable, in solido, with that person, for the damage caused by such act.
>
> Persons whose concurring fault has caused injury, death or loss to another are also answerable, in solido; provided, however, when the amount of recovery has been reduced in accordance with the preceding article, a judgment debtor shall not be liable for more than the degree of his fault to a judgment creditor to whom a greater degree of negligence has been attributed, reserving to all parties their respective rights of indemnity and contribution.

(West Supp.1984). *Id.* art. 2104.

**27.** In 1960, La.Rev.Civ.Code art. 2103 read: "The obligation contracted *in solido* towards the creditor, is of right divided amongst the debtors, who amongst themselves, are liable each only for his part and portion."

**28.** Article 2103, *as amended* by Acts of 1960, No. 30, § 1, read as follows:

> When two or more debtors are liable in solido, whether the obligation arises from a contract, a quasi contract, an offense, or a quasi offense, it should be divided between them. As between the solidary debtors, each is liable only for his virile portion of the obligation.
>
> A defendant who is sued on an obligation which, if it exists, is solidary may seek to enforce contribution, if he is cast, against his solidary co-debtor by making him a third party defendant in the suit, as provided in Article 1111 through 1116 of the Code of Civil Procedure, whether or not the third party defendant was sued by the plaintiff initially, and whether the defendant seeking to enforce contribution if he is cast admits or denies liability on the obligation sued on by the plaintiff.

This article was amended again in 1979. *See supra* note 26.

provisions of Revised Civil Code Article 2315 [the basic codal source of negligence liability]. Rather, they spring from the principle of contribution, enunciated in Article 2103 and our jurisprudence.... And it is only after judicial demand has been made on one of two or more solidarily obligated tort feasors that he can have any possible interest in seeking contribution.

142 So.2d at 798 (citations omitted). Accordingly, the court held that the defendant's indemnity action would stand under the new amendment since judicial demand was made on the defendant after its effective date. Finally, the court noted that since no substantive rights existed as between the joint tortfeasors before the amendment took effect, the rule against legislative revocation of existing substantive rights was irrelevant. *Id.; cf. Brown v. New Amsterdam Cas. Co.,* 136 So.2d 283, 285 (La.App.1961), and cases cited therein.

In *Lanier v. T.L. James & Co.,* 148 So.2d 100 (La.App.1962), the court had before it a situation the precise opposite of that before the *Brown* court. In *Lanier,* the plaintiff filed his damages action before the effective date of the 1961 amendment. Even though the original defendant's indemnity demand was filed after the effective date, the court, following *Brown,* held that the indemnity demand could not stand because the cause of action arose under the pre-amendment article 2103 and the amendment was not to be applied retroactively. 148 So.2d at 104–05.

■ It is abundantly clear, then, that for purposes of determining the applicability of a statute which gives rise to a new form of a cause of action (for that was the effect of article 2103 as amended), the cause of action in contribution arises when judicial demand is made on one of the joint tortfeasors. Since this principle derives from the nature of the theoretical source of the

contribution action itself, we see no reason why it should not also operate when the applicability of a different kind of statute, such as § 23:1032, is in issue.[29] We must conclude that in the Southern-Halter cases the manufacturers' causes of action for contribution arose when Julius Ducre filed suit against them.

All parties concede that the victims' actions in the Southern-Halter cases were filed, at the earliest, subsequent to October 1, 1976, the effective date of § 23:1032. Thus, when the manufacturers' causes of action for contribution against the executive officers arose, § 23:1032 was in operation barring non-statutory negligence actions brought by the injured employee himself. The sole remaining question is whether § 23:1032 operates in the same fashion to bar third-party actions for contribution as well as direct actions by the employee.

Louisiana courts have consistently ruled that § 23:1032 bars third party actions in the same manner as it bars, by its explicit terms, direct actions by an employee. Thus, a third party, sued by an employee covered by the Workmen's Compensation Act, could not obtain contribution from the cotortfeasor-employer when, under the predecessor of the current § 23:1032, the employer enjoyed immunity from direct suit by the employee. *Sanderson v. Binnings Constr. Co.,* 172 So.2d 721, 723 (La. App.1965); *Hebert v. Blankenship,* 187 So.2d 798, 801, (La.App.1966) (Tate, J.); *McLaughlin v. Braswell,* 207 So.2d 158, 159 (La.App.1968), *writs denied* 251 La. 1076, 208 So.2d 535 (1968); *Badeaux v. Patterson Truck Line,* 247 So.2d 875, 885 (La.App.), *writs denied* 259 La. 77, 249 So.2d 209 (1971); *Yale & Towne Manuf. Co. v. J. Ray McDermott,* 347 F.2d 371 (5th Cir.1965); *see also Auld v. Globe Indemnity Co.,* 220 F.Supp. 96, 101 (W.D.La.1963). *But see, Robinson v. National Auto & Cas. Co. Ins. Co.,* 75 F.Supp. 489, 490 (W.D.La.1948) (action by third party for

---

**29.** Indeed, the *Brown* principle has been followed in deciding other less relevant issues, such as when prescription commences in a third party action. *See Avondale Shipyards, Inc. v.*

*Vessel Thomas E. Cuffe,* 434 F.Supp. at 933 n. 15 (Rubin, J.) ("[P]resumably, prescription [in an *indemnity* action] would commence on the date of judicial demand.").

contribution against employer permitted under precursor of § 23:1032).[30] Finally, after the amendment to § 23:1032 took effect, it was held, although without explanation or citation of authority, that executive officers and other fellow employees of the injured employee are similarly immune to third party demand. *Waggoner v. Kellogg-Moore Oil Co.*, 375 So.2d 197, 200 (La.App. 1979); *see also Mobley v. Rego*, 412 So.2d 1143, 1155 n. 16 (La.App.), *writs denied* 414 So.2d 774 (La.1982).

We must conclude from the concerted operation of Louisiana contribution principles and the Workmen's Compensation Act that the equipment manufacturers' causes of action against the executive officers for contribution based on negligence arose only after they were barred. Consequently, summary judgment in favor of the executive officers should have been fully granted.[31]

### 2. *Contribution for Intentional Acts*

The Southern and Halter executive officers sought summary judgment as to the equipment manufacturer's allegations that, in governing Ducre's activities, they intentionally caused injury to him. In its initial opinion, the district court ruled on Halter's motion.[32] Although Halter, before the district court in its motion and before us in its brief, confuses arguments in support of summary judgment, *see* Fed.R.Civ.P. 56, with arguments in support of dismissal for failure to state a claim, *see* Fed.R.Civ.P. 12(b)(6), the district court merely held that, taking as true the allegations in the com-

plaints, claims in intentional tort were stated. In its second opinion, the court did not disturb its denial of the executive officers' motions. *Ducre*, 573 F.Supp. at 392. Approaching the issue as one arising only under Rule 12(b)(6), we affirm.

Section 23:1032, as amended, does not grant to executive officers immunity to liability for intentional acts. It states, in part, that "[n]othing in this Chapter shall affect the liability of the employer, or any officer ... of such employer ... to ... liability, civil or criminal, resulting from an intentional act." La.Rev.Stat.Ann. § 23:1032 (West Supp.1984). In *Bazley v. Tortorich, supra*, the Louisiana Supreme Court defined the state of mind requisite to showing an "intentional act" under the statute. The court wrote:

> [T]he meaning of "intent" is that the person who acts either (1) consciously desires the physical result of his act, whatever the likelihood of that result happening from his conduct; or (2) knows that that result is substantially certain to follow from his conduct, whatever his desire may be as to that result. Thus intent has reference to the consequences of an act rather than to the act itself. Restatement (Second) of Torts, supra, § 8; LaFave and Scott, Criminal Law, § 28 (1972); see also, Prosser, [Law of Torts], § 8.

397 So.2d at 481. Under this definition there is no distinction between the state of mind requisite to finding an "intentional act" under the statute and that requisite to

---

**30.** The rationale for this prohibition is that since § 23:1032 provides that the employer's only obligation to his employee derives from the statutory obligation to compensate him regardless of the employer's fault, the employer has no obligation in tort and, consequently, cannot possibly be solidarily liable with the third party under articles 2091 and 2103, the statutory sources of the contribution action. *Sanderson*, 172 So.2d at 723; *Auld*, 220 F.Supp. at 101.

**31.** Lest we bridle at the prospect of the executive officers' escaping liability completely, we are informed that Ducre is pursuing them in state court, pressing essentially the same claims advanced by the equipment manufacturers here.

We recognize the incongruence—in terms of maintainability—of the victim's cause of action, as controlled by *Owens*, with the third party manufacturer's action, as controlled by *Brown*. However, we think this incongruence inheres in *Brown's* understanding of the sources of the contribution action. *See Brown*, 142 So.2d at 798. Thus, the juxtaposition of our holding in part I with our holding in this part merely brings to light—it does not *create*—the incongruence which follows from the *Brown* principle.

**32.** The ruling was later applied to Southern's motion.

finding an intentional harm under general tort principles. *Id.*

◼ The third party complaint of Pulmosan Safety Equipment Corporation, similar in all pertinent respects to the complaints of the other manufacturers, set forth its allegation as to intentional acts as follows:

> In the alternative, Pulmosan avers that third party defendants intentionally caused the medical disorders of which plaintiff complains in that they were aware as early as 1968 that plaintiff was suffering from a lung disorder but continued to expose him to said dangerous substances knowing that he was substantially certain to further damage his lungs.

Pulmosan intentionally tracked the language of *Bazley* concerning state of mind. There is little more it could have done, initially, to state a cause of action. If the executive officers were, in fact, aware that Ducre was suffering from a lung disorder but continued exposing him to silica dust with knowledge that this exposure was substantially certain to cause further lung damage, then a sufficient factual predicate has been laid to show the requisite intent. Rule 12(b)(6) requires no more. In order to justifiably dismiss a complaint under Rule 12(b)(6), a court must be satisfied "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957). We are not, nor was the district court, so satisfied. Accordingly, we affirm the court's denial of the Southern and Halter motions to dismiss.[33]

## III. INSURANCE COVERAGE

◼ Commercial Union sought summary judgment against the Avondale and Southern executive officers, arguing that the occurrence endorsements of its policies preclude coverage of employer liability for diseases manifested in the victims after the policies lapsed. The fact that the alleged delictual acts of the executive officers and the consequent exposure of the employees to silica dust took place during the term of the policies, Commercial Union asserted, makes no difference. Commercial Union's position is labelled, for ease of reference, the "manifestation theory." The executive officers responded that the time of exposure, not manifestation, is the critical time for determining coverage. They urge us to adopt an "exposure theory."

The policies contained the following "Insuring Agreement":

> I. Coverage A—Bodily Injury Liability: [Insurer agrees to pay] on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by any person and caused by an accident.

The policies were amended by an "Occurrence Endorsement" which read as follows:

> Such insurance as is afforded by the policy for Bodily Injury Liability ... applies subject to the following provisions:
>
> 1. In insuring Agreement I, the words "and caused by accident" are deleted.
>
> 2. The term "occurrence" is substituted for "accident" wherever else it appears, except in the "defense; settlement; supplementary payments" insuring agreement and "assistance and cooperation" condition.
>
> 3. "Occurrence" means either an accident or a continuous or *repeated exposure to conditions which results during the policy period in injury to persons* or real or tangible property which is accidentally caused. All damages arising out of such exposure [to] substantially

---

**33.** Although Halter presented, in its motion before the district court and in its brief before us, material outside the pleadings, there is no indication that the district court considered it. Further, the court's language affirmatively indicates that it decided the motion as a motion to dismiss. We therefore treat it as such. *See Bruce* *v. Wade,* 537 F.2d 850, 852–53 n. 4 (5th Cir. 1976); *cf. Davis v. Howard,* 561 F.2d 565, 568–69 (5th Cir.1977) (consideration of matter outside pleadings automatically converts motion from one decided under Rule 12(b)(6) to one decided under Rule 56).

the same general conditions shall be considered as arising out of one occurrence. 4. Under the Bodily Injury Liability Coverage, injury intentionally inflicted shall be deemed an accident unless committed by or at the direction of the insured....

(emphasis added). Commercial Union argues that where the subject disease, manifests itself after the policy has lapsed, "injury" has not "result[ed] during the policy period." The executive officers—and their insurers for periods other than those in which Commercial Union was "on the risk" —argue that injury results when the victim is exposed to the damaging agent. The issue, succinctly stated, is: When does "injury" take place in the latent disease context?

The district court, purporting to interpret "the clear meaning of the [policy's] words", rejected both the manifestation and the exposure theories and held that coverage would obtain to the extent that "real but undiscovered injury [is] proved in retrospect to have existed at the relevant time." *Ducre*, 573 F.Supp. at 393 (quoting *American Home Products Corp. v. Liberty Mutual Ins. Co.*, 565 F.Supp. 1485, 1497 (S.D. N.Y.1983)). On this basis the court partially granted summary judgment in Commercial Union's favor.

In reaching its conclusion the district court followed *American Home Products Corp.* and distinguished our holding in *Porter v. American Optical Group*, 641 F.2d 1128 (5th Cir.), *cert. denied* 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981). Because we think *Porter* is a non-distinguishable statement of Louisiana law, we must reverse.

In *Porter*, an asbestosis case brought on grounds of defective respirator equipment and employer negligence, we explicitly adopted the reasoning and result of *Insurance Co. of North America v. Forty-Eight Insulations, Inc.*, 633 F.2d 1212 (6th Cir. 1980), in which the court rejected the manifestation theory and approved the "injurious exposure" theory. *Porter*, 641 F.2d at 1145. Thus, we held that the term "bodily injury" in the "occurrence" policies meant exposure to asbestos particles. *Id.* Aetna, whose policy had expired before the victim's disease had been manifested or diagnosed, was therefore liable to its insured for indemnity and defense because the victim had been exposed during its policy term. *Id.* To avoid liability Aetna would bear the burden of showing that its insured's products were not used during the victim's tenure in the insured's plant. *See Forty-Eight Insulations*, 633 F.2d at 1225. Otherwise, it must bear a pro rata share of liability in relation to the coverage of other insurers during the victim's exposure. *Porter*, 641 F.2d at 1145; *Forty-Eight Insulations*, 633 F.2d at 1225.

Commercial Union contends that in *Porter* we did not apply Louisiana law. This contention directly contradicts our clear expression in *Porter* to the contrary. *Porter*, 641 F.2d at 1145. Of course, Louisiana courts have not ruled on this issue of contract interpretation. Yet Commercial Union argues not merely that *Porter* was an unjustifiable extension of Louisiana law, but that it runs counter to the "trend" in Louisiana towards adoption of the manifestation theory. In support of its argument it cites several cases which we think are distinguishable.

Commercial Union contends that *Porter* conflicts with and the instant case is controlled by *Oceanonics, Inc. v. Petroleum Distributing Co.*, 292 So.2d 190 (La.1974). There, the court held that an occurrence policy, like the one in issue here, precluded coverage of damage resulting from faulty maintenance conducted on a crane during the policy period, which caused the crane's collapse after the policy expired. We think *Oceanonics* is not controlling because it involved an interpretation of a completely different coverage provision, namely, a "Completed operations hazard" provision. *See Oceanonics, Inc. v. Petroleum Distributing Co.*, 280 So.2d 874, 876 (La.App. 1973). Further, property damage and not personal injury was at issue in *Oceanonics;* the court interpreted the term "property damage" in the occurrence endorsement,

not the term "bodily injury". Finally, the *Oceanonics* court applied the policy to damage caused by a discrete tortious act, not by a gradual and latent disease process. To that extent, the complex concerns with difficulty of proof and fairness of risk distribution, so effectively addressed in *Forty-Eight Insulations,* were not at stake in *Oceanonics.* We are unconvinced that *Oceanonics* evidences any "trend" in the law of Louisiana either in conflict with *Porter* or relevant to the issue before us.

Commercial Union also cites *Fazande v. Continental Grain Co.,* 363 So.2d 1253 (La.App.1978), as evidence of the manifestation trend. Liability of the insurer in that case, however, was premised, not on an occurrence endorsement and the fact that the disease manifested itself during the insurer's policy term, but on a provision which stated that the policy applied "to injury ... by disease caused or aggravated by exposure, of which the last day of the last exposure, in the employment of the insured, to condition's causing the disease occurs during the policy period." *Fazande,* 363 So.2d at 1258. No such provision is found in Commercial Union's policies.

Commercial Union cites no other case, decided either before or after *Porter,* that can reasonably be read to support the alleged manifestation trend.[34] We note, in passing, the Louisiana Supreme Court's observation, in holding that silicosis could be an "injury" under the insurance policy before it, that "[t]he description of silicosis found by the Court of Appeal sounds more like a series of injuries than like a disease." *Jennings v. Louisiana and Southern Life Ins. Co.,* 290 So.2d 811, 814 (La.1974). This is consistent with the description of the medical evidence in *Porter* to the effect that "each introduction of [asbestos] fibres into Porter's lungs was 'bodily injury' cumulatively and progressively more harmful to the victim." 641 F.2d at 1144. We conclude that *Porter* represents this circuit's best "Erie" guess as to the current state of Louisiana law. *See Smith Petroleum Service, Inc. v. Monsanto Chemical Co.,* 420 F.2d 1103, 1111–12 (5th Cir.1970).

The district court's attempt to distinguish *Porter* is unconvincing.[35] First, the policies construed in *Porter* were, in all material respects, similar to Commercial Union's policies. All of the policies are "occurrence" policies[36] in which coverage is provided for bodily injury caused by an "occurrence." *Porter,* 641 F.2d at 1145. All of the policies define "occurrence," the critical word, in similar terms. *Id.* All of the policies have the same impact: limiting liability to personal injury sustained during the policy period through exposure to certain conditions. The district court cited no specific material differences in the policies and we can find none.

The district court's comment to the effect that in *Porter* we "passed" on the present issue is also indefensible. Footnote 18 of *Porter,* which the district court cited to support its comment, discussed the inapplicability of a provision which excluded coverage of damage resulting from a design defect in the insured's product. We cannot see how our comment in *Porter* that it was unnecessary to determine the applicability of that exclusion avoided the issue before us here. Indeed, the language in *Porter* following the text at footnote 18 repeats the district court's holding in *Por-*

---

**34.** In an admirable feat of mental gymnastics, Commercial Union argues that *Porter's* holding conflicts with the *failure* of the Louisiana Court of Appeal in *Faciane v. Southern Shipbuilding,* 446 So.2d 770 (La.App.1984), to say that the victim's cause of action against his employer's executive officers arose at the moment he was first exposed to silica dust. We cannot see that *Faciane* is apropos since the issue referred to did not deal with an insurance policy but with the accrual of a cause of action under La.Rev. Stat.Ann. § 23:1032, which we discuss above.

**35.** We observe that Commercial Union does not attempt to distinguish *Porter.*

**36.** Avondale's executive officers have apparently abandoned on appeal the argument, pressed below and convincingly laid to rest by the district court, that certain pre-1966 policies issued to them by Commercial Union are not, in fact, "occurrence" policies. *See Ducre,* 473 F.Supp. at 394.

ter that "the Aetna policy did not provide coverage because exposure to the asbestos during its coverage did not result in a *manifestation* of injury sickness or disease and, therefore, there was no occurrence of bodily injury." 641 F.2d at 1143–44. It was this holding that, in *Porter*, presented the same issue we confront here. It was this holding that we explicitly rejected in *Porter* when we adopted the "exposure" theory and held that Aetna was liable for its pro rata share of coverage regardless of when the victim's disease became manifest. It is beyond cavil that *Porter* decided the very issue presented to us in this appeal.

*Porter* cannot be distinguished on any other ground. There is no evidence, nor does Commercial Union argue, that silicosis is sufficiently different from asbestosis, in onset or development, to justify distinguishing *Porter*. We note, however, that an important underpinning of *Porter* and *Forty-Eight Insulations* was the medical evidence in those records to the effect that each exposure to asbestos fibers resulted in damage to the victims' lungs. *Porter*, 641 F.2d at 1144; *Forty-Eight Insulations*, 633 F.2d at 1222. The parties should be afforded the opportunity to develop such evidence in the Avondale and Southern-Halter cases. If they cannot adduce any such evidence, reliance on *Porter* would be seriously undermined.[37]

However, having determined, for present purposes, that *Porter* decided, under Louisiana law, the precise issue before us in a sufficiently similar setting, we follow its adoption of *Forty-Eight Insulations* and require that the exposure theory be applied to the Commercial Union policies. We reverse the district court's partial grant of summary judgment to the extent it is inconsistent with *Porter*.

## IV. CONCLUSION

Having traveled such a long and arduous path, we pause to summarize the conclusions we have reached along the way. In the Avondale cases, with respect to the issue of executive officer liability, we reverse and remand for development of the evidence in accordance with *Owens, supra*. In the Southern-Halter cases, with respect to the issue of executive officer liability for indemnity, we reverse and remand for entry of judgment in favor of the executive officers; with respect to executive officer liability for contribution based on negligence, we reverse and remand for entry of judgment in favor of the executive officers; with respect to executive officer liability for contribution based on intentional acts, we affirm the district court's denial of the motion to dismiss and remand for further proceedings consistent with this opinion. In both the Avondale and the Southern-Halter[38] cases, with respect to the issue of

**37.** The only other basis for distinguishing *Porter* that suggests itself is that the insureds in *Porter* were the safety equipment manufacturers, not the victim's employers. *Porter*, 641 F.2d at 1144. In *Forty-Eight Insulations*, the insureds were manufacturers of asbestos products. 633 F.2d at 1214. Thus, in *Porter*, as well as in *Forty-Eight Insulations*, the insureds were manufacturers of products which either injured or failed to protect the victims. In the cases before us the insureds are the victims' employers. Although in all three settings the main underlying theory is the same, namely, failure to warn, in the employer-insured context before us the insured does not encounter the nearly intractable problem of proving whose products were used for what period of time during the victims' exposure. This proof problem was an important rationale in *Forty-Eight Insulations*. *See* 633 F.2d at 1225 n. 27. However, since the exposure theory is more consistent with the relevant principles of contract interpretation,

see *Forty-Eight Insulations*, 633 F.2d at 1222–23, with the expectations of the parties, *see id.* at 1223, and with the underlying theory of primary liability outlined in *Borel v. Fibreboard Paper Products*, 493 F.2d 1076 (5th Cir.1973), *cert. denied*, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974), *see Forty-Eight Insulations*, 633 F.2d at 1225, we think this distinction is not sufficient to justify a different rule for the employer-insured context, especially in view of the supremely important interests in predictability and certainty which lie at the heart of contract law.

**38.** Since in the Southern-Halter cases the executive officers have been absolved of liability except for that based on contribution for intentional acts, their insurer, Commercial Union, has also been absolved to the same extent. Further, Commercial Union's policies exclude liability for "injury intentionally inflicted" by acts "committed by or at the direction of the insured." *See supra* text at 32; *Ducre*, 573 F.Supp.

Commercial Union's liability under the occurrence provisions of its insurance policies, we reverse and remand for further proceedings in accordance with *Porter, supra.*

AFFIRMED IN PART; REVERSED AND REMANDED IN PART.

at 393. Thus, in the Southern-Halter cases Commercial Union is exposed to liability only to the extent that its insured, Southern's, executive officers, may be held liable for "injury intentionally inflicted" by acts that fall outside the exclusion. *See supra* note 8, where we decline at this stage to reach the exclusion clause issue as it concerns vicarious liability. We express no opinion as to whether this or other forms of liability for "injury intentionally inflicted" may fall outside the exclusion.