**CLEMCO INDUSTRIES, a California general partnership, Plaintiff,**

v.

**COMMERCIAL UNION INSURANCE COMPANY, a Massachusetts corporation, Defendant.**

**No. C–85–1464 WHO.**

United States District Court,
N.D. California.

April 23, 1987.

Reuben J. Becker, Silberman & Becker, Robert E. Schaberg, Law Offices of Robert E. Schaberg, Sausalito, Cal., for plaintiff.

Michael L. Marx, Nannette De Lara, Bishop, Barry, Howe & Reid, San Francisco, Cal., for defendant.

## OPINION AND ORDER

ORRICK, District Judge.

Plaintiff, Clemco Industries ("Clemco"), a California general partnership engaged in the manufacture of sandblasting protection equipment, was insured by defendant, Commercial Union Insurance Company ("Commercial"), a Massachusetts corporation, for the years 1970–76 under three consecutive comprehensive general liability policies. Those policies insured Clemco against, among other things, damages sustained by Clemco arising from the contraction of silicosis by users of its equipment, allegedly due to the faulty manufacture of the equipment. Clemco brings this declaratory relief action to answer the question whether an "occurrence," as the same is defined in the three policies here in question, commences when the user is first exposed to the silica dust-causing silicosis (the "exposure theory"), or whether an "occurrence" commences only when the disease manifests itself (the "manifestation" theory), usually in the form of a medical diagnosis. This action was tried to the Court, both parties having the opportunity to present evidence and witnesses, and to cross-examine. For the reasons following, this Court determines that the California Supreme Court is most likely to choose the time of exposure as the most appropriate measure of occurrence under the terms of the applicable policies.

I

Clemco is presently faced with a large number of lawsuits arising out of their manufacture of sandblasting protection equipment. These suits allege for the most part that Clemco's equipment and lack of adequate warning contributed to the contraction of the disease of silicosis by sandblasters using the equipment. Clemco was insured by five different insurance carriers during the period of manufacturing the equipment, and has requested that all five carriers defend and indemnify Clemco against these suits. The other insurance carriers of Clemco have already agreed to defend and indemnify Clemco against damages sustained as a result of the numerous lawsuits; only Commercial has refused to do so.

Commercial argued that the lawsuits involve injuries that did not "occur" during their policy periods because the individuals' silicosis did not "manifest" itself, or was not diagnosed, until long after Commercial's policies had expired. Clemco argued that many of the individuals presently bringing suit against it were "injured" during the coverage of Commercial's policies because those individuals, although not diagnosed as having silicosis until much later, were "exposed" to the silica during the period in which Commercial's policies were in effect. This Court is thus faced with the difficult dilemma that has troubled numer-

ous other courts in similar contexts: under the terms of the insurance policies similar to the ones in the case at bar, does "bodily injury" in the form of silicosis "occur" when the individual, later diagnosed as having silicosis, was "exposed" to the silica, or when the disease "manifests" itself, usually in the form of diagnosis.

At the outset, the Court notes that under the mandate of *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), the obligation of a district court sitting in diversity jurisdiction is to interpret and apply state law. Clemco urges, and Commercial apparently concedes, that California state law will govern the interpretation of the subject insurance contracts in this action. However, because this case involves a California plaintiff and a Massachusetts defendant, there is a potential issue on the appropriate choice of law.

As a district court in a diversity case, this Court "must apply the same choice of law analysis that would be applied by state courts in the jurisdiction in which the district court is situated." *Liew v. Official Receiver & Liquidator*, 685 F.2d 1192, 1195 (9th Cir.1982), *citing Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). The choice-of-law analysis adopted by the California courts is the "governmental interest" analysis. *Offshore Rental Co. v. Continental Oil Co.*, 22 Cal.3d 157, 148 Cal.Rptr. 867, 583 P.2d 721 (1978). Under the "governmental interest" analysis, if there is a "true conflict," i.e., the two competing states' laws differ and both have an interest in having their law applied to the action at hand, then the court must apply the "comparative impairment" approach to "determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state." *Liew*, 685 F.2d at 1196 n. 6, *citing Offshore Rental*, 22 Cal.3d at 164–65, 148 Cal.Rptr. at 872, 583 P.2d at 726 (1978).

California and Massachusetts state law differs in some respects on the interpretation of insurance contracts. *Compare* *Garcia v. Truck Insurance Exchange*, 36 Cal.3d 426, 204 Cal.Rptr. 435, 682 P.2d 1100 (1984), *with Cody v. Connecticut General Life Insurance Co.*, 387 Mass. 142, 439 N.E.2d 234 (1982). This Court finds that only California has a "true interest" in having its laws applied in this action; Massachusetts does not have an interest in having its laws applied to insurance policies entered into between its resident insurance companies and foreign residents when those policies are executed in the foreign resident's jurisdiction. Assuming, *arguendo*, that Massachusetts does have an interest in the application of its laws to the present action, and there is thus a "true conflict," the Court finds that California's interests would be "more impaired" if Massachusetts' laws were applied. California has a very strong interest in regulating insurance contracts entered into with its own residents in its own jurisdiction and with policing insurance contracts executed in its own jurisdiction. In addition, Clemco is a California resident that employs California residents and pays taxes to California, and has an expectation that California law will govern the insurance contracts it enters into within California. Therefore, California law will govern the determination of this action. In the absence of any clear state law, this Court will attempt to apply the law the California Supreme Court would apply were it faced with the same issues.

At the hearing on December 13, 1985, this Court expressly held that the insurance policies issued by Commercial were "adhesion contracts" under California state law. The Court stated that Clemco "was able to bargain with Commercial Union regarding things like how much insurance it wanted, and what limits, and where, and who was to be covered. But it had no power to bargain over the definitions and conditions." Reporter's Transcript, Dec. 13, 1985, at 12. The Court deemed the insurance policies to be adhesion contracts under the authority of *Ponder v. Blue Cross of Southern California*, 145 Cal. App.3d 709, 193 Cal.Rptr. 632 (1983).

Prior to trial, and indeed throughout the trial, Commercial continued to argue that the policies were not adhesion contracts and sought to have the Court modify its ruling. In support of its argument, Commercial pointed to the fact that Clemco was a large corporation with substantial annual sales, it procured the coverage through an insurance broker, and it was able to bargain on relatively equal terms with Commercial concerning the issuance of the policies. Commercial relied primarily on the cases of *Garcia, supra, Madden v. Kaiser Foundation Hospitals,* 17 Cal.3d 699, 131 Cal.Rptr. 882, 552 P.2d 1178 (1976), and *Travelers Indemnity Co. v. United States,* 543 F.2d 71 (9th Cir.1976).

Commercial failed to note that the single most significant factor in all of the cases it relied upon is that the insured had *participated* in the actual drafting of the terms, language, and/or options offered in the insurance policies that were considered. In *Garcia,* the California Supreme Court found that, contrary to the general rule that insurance contracts are adhesion contracts, the policies at issue were not adhesion contracts. The Court specifically relied on two facts: (1) the insured was the California Hospital Association, a large institutional organization with "substantial bargaining power vis-a-vis the carrier," and (2) that the policy had been *mutually* drafted. *Garcia,* 36 Cal.3d at 438, 204 Cal.Rptr. at 441, 682 P.2d at 1106. Similarly, in *Madden,* the Court found that the insured, a group of state employees represented by the Board of Administrators of the State Employee Retirement System, had benefited from the considerable leverage exercised by the Board over the carrier in compiling the various coverage plans, and had benefited from the Board's participation in the drafting of the terms and options of the policies offered to the insured. The court, therefore, refused to apply the principles governing adhesion contracts to the policies at issue. *Madden,* 17 Cal.3d at 710–11, 131 Cal.Rptr. at 889–90, 552 P.2d at 1185–86. Finally, in the *Travelers* case, the Ninth Circuit found that, under Oregon law, the policy would not be governed by the rules of interpretation for adhesion contracts because the terms of the policy had been supplied by the *insured. Travelers,* 543 F.2d at 74–75.

It is clear from the evidence presented at trial that Clemco had absolutely no input in the drafting of the language or the choice of the terms used in these policies. In fact, these policies are identical in all relevant respects for the purposes of this action to the Comprehensive General Liability ("CGL") policy, which is the standard policy used throughout the insurance industry. The CGL policy was drafted in the mid–1960's by two national committees established by the insurance industry in order to address "difficulties faced by the courts and the parties in dealing with personal injury and property damage sustained as a result of gradual processes." *American Home Products Corp. v. Liberty Mutual Insurance Co.,* 565 F.Supp. 1485, 1501 (S.D.N.Y.1983), *modified,* 748 F.2d 760 (2d Cir.1984); *see Insurance Co. of North America v. Forty-Eight Insulations, Inc.,* 633 F.2d 1212, 1216 (6th Cir.1980), *clarified,* 657 F.2d 814, *cert. denied,* 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981). Clemco was obviously in a far different position from the insureds in *Garcia, Madden,* and *Travelers.* At best, Clemco was only able to bargain with Commercial as to the the amount of coverage, the premiums for certain coverages, and the inclusion of certain additional boilerplate provisions at a reasonable premium. As stated at the hearing on December 13, 1985, Clemco was in an unequal bargaining position with Commercial and did not participate in the drafting of the policies in this action. The Court reaffirms the finding that the insurance policies issued by Commercial are adhesion contracts under California law, and they will be treated as such for purposes of this action. Additionally, the definitions in the policies at issue for the terms "bodily injury," "disease," and "occurrence" are deemed identical in all relevant respects to the definition of those terms under the standard CGL policies issued throughout the insurance industry.

The parties stipulated that the relevant language in the policies for this action is

contained in the definitions provided for the terms "bodily injury" and "occurrence" and, under the terms of each policy, "bodily injury" and "occurrence" are defined as follows:

> Bodily injury [is] defined to include sickness or disease, sustained by any person by reason of an occurrence, [which is] defined to include accidents, including injurious exposure to conditions, which results, during the policy period, in bodily injury neither expected not intended from the standpoint of the insured.

Joint Pretrial Statement, filed Jan. 8, 1986, at 3–4. The Court notes that the policies themselves, entered into evidence as Clemco's Exhibit No. 1, state that bodily injury "means bodily injury, sickness, or disease" (Clemco's Exhibit No. 1, at 3), and that "for the purposes of determining the limit of the company's liability, all bodily injury and property damage arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence." *Id.* at 2.

■ The parties made motions *in limine* to have the Court determine the character of the phrase "neither expected nor intended." Specifically, Clemco argued that though the phrase was found in the definition of coverage, in fact it operated as an exclusion. Therefore, under California law, the burden fell on Commercial to prove that Clemco fell within the terms of the exclusion in order to deny coverage. *Executive Aviation, Inc. v. National Insurance Underwriters,* 16 Cal.App.3d 799, 806, 94 Cal.Rptr. 347, 351 (1971). Commercial asserted that the phrase was part of the definition of the policies' coverage, and in effect shaped the grant of coverage itself. If true, it would then be Clemco's burden to prove that it neither "expected nor intended" the losses sustained in order to come under the terms of the policies' coverage. The Court found that the phrase was an exclusion of coverage under the policy, and it was Commercial's burden to prove that Clemco came within its terms if it wished to deny coverage.

The "expected or intended" language was first adopted by the insurance industry in 1966 to resolve the uncertainties that had arisen concerning whether an "accident" under the standard insurance policy should be evaluated from the perspective of the insured or the injured victim. *See* Annotation, Construction and Application of Provision of Liability Insurance Policy Expressly Excluding Injuries Intended or Expected by Insured, 31 A.L.R.4th 957, 971–72 (1984). The language was incorporated into the "occurrence" definition in order to accomplish the desired clarification. The placement of the phrase, however, in no way changed the effect or character of the phrase; "expected or intended" remained an exclusion of the coverage grant by the very operation of its terms.

The testimony of both Clemco's and Commercial's insurance experts supported this conclusion. Clemco's expert, Professor Temple, stated very convincingly that "while [the phrase] does not appear under a heading of 'exclusion,' it's not uncommon in policies to have exclusions within insuring clauses. So, yes, it serves as a way of excluding coverage for claims that would fall within that language.... [I]n our industry, we construe that to be an exclusion." Reporter's Transcript, Oct. 7, 1986, at 288. Furthermore, Claude C. Lilly, Commercial's own insurance expert, stated: "It basically serves as an exclusion." Deposition of Claude C. Lilly, filed Mar. 4, 1986, at 45. Additionally, those California courts that have had occasion to interpret the same language have also found that the "expected or intended" phrase is in fact an exclusion. *United States Fidelity & Guaranty Co. v. American Employer's Insurance Co.,* 159 Cal.App.3d 277, 205 Cal.Rptr. 460, (1984); *Cf. Beaumont-Gribin-Von Dyl Management Co. v. California Union Insurance Co.,* 63 Cal.App.3d 617, 623, 134 Cal.Rptr. 25, 27 (1976).

Assuming, *arguendo,* the above authorities do not resolve the issue, the Court finds the phrase "expected or intended" ambiguous in terms of its operation and effect in the policies. Under the California law, " 'any ambiguity or uncertainty in an insurance policy is to be resolved against the insurer and ... if semantically permissible, the contract will be given such con-

struction as will ... provid[e] indemnity for the loss to which the insurance relates.'" *White v. Western Title Insurance Co.*, 40 Cal.3d 870, 881, 221 Cal.Rptr. 509, 513, 710 P.2d 309, 313 (1985), *citing Reserve Insurance Co. v. Pisciotta*, 30 Cal.3d 800, 807–08, 180 Cal.Rptr. 628, 632, 640 P.2d 764, 768 (1982) (*en banc*). Furthermore, "[w]hereas coverage clauses are interpreted broadly so as to afford the greatest possible protection to the insured ... exclusionary clauses are interpreted narrowly against the insurer." *Id.* (citations omitted). Therefore, the coverage grant in the policies issued by Commercial must be interpreted broadly and so as to provide indemnity, compelling the conclusion that the limiting phrase of "expected or intended" is in fact an exclusion designed to deny coverage in certain narrow instances.

The Court found that Commercial had the burden of proving that plaintiff either "expected or intended" the losses for which Clemco seeks coverage. Clemco's expert testified that in order to come within the terms of "expected or intended," the insured had to engage in "deliberate actions taken for the express purpose of accomplishing a specific goal." In other words, for purposes of this phrase, "expected" and "intentional" are "two sides of the same coin." Trial Transcript, Oct. 7, 1986, at 327. Thus, in order for Commercial to prove that Clemco "expected or intended" the losses for which it seeks coverage, Commercial had to prove that Clemco engaged in some conscious, calculated, or deliberate act(s) that directly led to the losses that are now the subject of the disputed coverage. *See Hogan v. Midland National Insurance Co.*, 3 Cal.3d 553, 91 Cal. Rptr. 153, 476 P.2d 825 (1970); *Economy Lumber Co. of Oakland v. Insurance Co. of North America*, 157 Cal.App.3d 641, 204 Cal.Rptr. 135 (1984). *See also United States Fidelity, supra.*

## II

■ As discussed above, this action centers on the interpretation of the insurance policies issued by Commercial under California law as they apply to claims arising out of the disease of silicosis. In essence, this Court must determine at what point the policies issued by Commercial intended that the disease of silicosis would give rise to coverage under the "bodily injury" provision. In order to determine that, the Court must decide whether silicosis "occurs" for purposes of the policies issued by Commercial when the victims are "exposed" to the silica dust, when the disease of silicosis "manifests" itself, or at some other definable time. Though this conundrum has been faced by numerous jurisdictions, and numerous learned and often conflicting opinions have been rendered, this precise issue has yet to considered by the California courts. *Cf. Hancock Laboratories, Inc. v. Admiral Insurance Co.*, 777 F.2d 520 (9th Cir.1985); *California Union Insurance Co. v. Landmark Insurance Co.*, 145 Cal.App.3d 462, 193 Cal.Rptr. 461 (1983) (progressive damage to swimming pool was "one occurrence" from time of initial installation, somewhat analogous to backache; court rejected "manifestation" theory of "occurrence"). Therefore, this Court will make its best *"Erie* guess" as to how the California Supreme Court would decide this issue if it were before the Court. *See Ducre v. Executive Officers of Halter Marine, Inc.*, 752 F.2d 976, 993 (5th Cir.1985).

The parties have presented the Court with a choice between two theories of "occurrence" for the application of the policies to losses involving silicosis, namely, the "exposure" theory versus the "manifestation" theory. Because progressive and cumulative diseases, especially those resulting from exposure to toxic substances, clearly exist before external observations and/or medical diagnosis reveal the diseases, it is difficult in many situations to "determine what occurrence triggers liability under a particular policy." *Hancock Laboratories*, 777 F.2d at 523. Clemco argues that the disease of silicosis, in virtually the same manner as the disease of asbestosis, begins shortly after the initial exposure to the harmful agents, the silica dust particles. The continued exposure to silica leads to a cumulative and progressive worsening of the victim's condition, until ulti-

mately the victim is diagnosed as having the disease of silicosis, often not until nearly twenty years after the initial exposure. Although the victim is not "diagnosed" until many years after the exposure has ceased, and thus is not aware of his or her condition even as it deteriorates, Clemco argues that the disease has "occurred" for purposes of the insurance policy upon the initial exposure.

Commercial asserted that the victim and, indeed, the entire medical profession, are unable to pinpoint precisely at what point the inhalation of silica rises to the level of a disease, and thereby "occurs" under the terms of the policy. Commercial argued that the only time at which the victim or the medical profession can be certain that the disease of silicosis has "occurred" is at the time of "manifestation," which in most circumstances will be the time of medical diagnosis. Commercial, therefore, urged the Court to find that because "injury" certain has not "occurred" until the disease manifests itself, the policies' coverage cannot be triggered until the manifestation of the disease in the individual victim.

As the Ninth Circuit has noted, there is a split among the circuits as to whether the time of exposure or the time of manifestation is the proper "trigger" of the coverage for "bodily injury" in cases involving "insidious" diseases. *Id.* The only circuit to specifically consider the issue in the context of the disease of silicosis was the Fifth Circuit in *Ducre.* In *Ducre,* the court approved of the adoption of the exposure theory for silicosis on the basis that "silicosis is [not] sufficiently different from asbestosis, in onset or development, to justify" adopting the exposure theory for asbestosis but not for silicosis. *Ducre,* 752 F.2d at 994. The court went on to note, however, that "an important underpinning of [the adoption of the exposure theory in the asbestosis case of] *Porter* [641 F.2d 1128 (5th Cir.1981] and *Forty-Eight Insulations* [633 F.2d 1212 (6th Cir.1980)] was the medical evidence in [the] record to the effect that each exposure to asbestos fibers resulted in damage to the victims' lungs." *Id.* The *Ducre* court explained that if on remand the trial court found that there

were significant differences between the two diseases, then the trial court might be justified in applying the manifestation theory to the disease of silicosis. However, the court did note that the "exposure theory is more consistent with the relevant principles of contract interpretation, with the expectations of the parties, and with the underlying theory of primary liability...." *Id.* at 994, n. 37 (citations omitted).

The majority of circuits ruling upon the application of either the exposure or manifestation theory to the "occurrence" of progressive and cumulative diseases have done so in the context of claims for asbestosis. The Third, Fifth, Sixth, and Eleventh Circuits have all ruled that coverage under the standard CGL policy is triggered by the exposure of the victim to the asbestos fibers during the policy period. *See AC and S, Inc. v. Aetna Casualty & Surety Co.,* 764 F.2d 968, 973 (3d Cir.1985); *Porter v. American Optical Corp.,* 641 F.2d 1128, 1145 (5th Cir.1981), *cert. denied,* 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981); *Forty-Eight Insulations,* 633 F.2d at 1223 (6th Cir.1980); *Commercial Union Insurance Co. v. Sepco Corp.,* 765 F.2d 1543, 1545–46 (11th Cir.1985). The First Circuit, on the other hand, held that coverage under a CGL policy was not triggered unless the disease of asbestosis manifested itself during the policy period. *Eagle-Picher Industries, Inc. v. Liberty Mutual Insurance Co.,* 682 F.2d 12 (1st Cir.1982), *cert. denied,* 460 U.S. 1028, 103 S.Ct. 1279, 75 L.Ed.2d 500 (1983). The Second Circuit has taken a slightly different approach, and has adopted the rule that coverage under a CGL policy for claims of asbestosis is triggered only by "injury in fact," though the injury need not necessarily be diagnosable or compensable. *American Home Products,* 748 F.2d at 765–66 (2d Cir.1984). And the D.C. Circuit has taken the "trigger requirement" one step further, holding that coverage for asbestosis is governed by a "continuous exposure theory," i.e., coverage is triggered by either "inhalation exposure, exposure in residence, [or] manifestation." *Keene Corp. v. Insurance Co. of North America,* 667 F.2d 1034, 1046–47

(D.C.Cir.1981), *cert. denied,* 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1982).

As can be seen from the above review, there are significant differences among the circuits on the proper theory to apply for coverage of diseases with long latency periods. However, the trend appears to be towards the adoption of the exposure theory as the proper "trigger" of coverage under CGL policies in the context of cumulative diseases with long latency periods. *See Burroughs Wellcome Co. v. Commercial Union Insurance Co.,* 632 .F.Supp. 1213, 1217 (S.D.N.Y.1986). Indeed, the exposure theory appears to be the "trigger theory" that is the most reasonable, administratively workable, and consistent with the intent of parties entering into CGL policies.

In California, as already mentioned, there has yet to be a ruling on the issues presented here. The most analogous case is *California Union, supra,* which involved insurance coverage for a swimming pool that was defectively installed. The condition of the pool progressively worsened until the defects were finally "manifested" years later. The court in *California Union* was faced with a very different factual scenario, but did appear to discuss the "exposure" theory in favorable terms. In fact, it adopted the reasoning of the Sixth Circuit in *Forty-Eight Insulations, supra,* as the basis for apportioning insurance coverage. However, because of the factual differences, and the court's erroneous interpretation of *Forty-Eight Insulations* in some regards, *see Hancock Laboratories,* 777 F.2d at 525, n. 10, the opinion of the California appellate court in *California Union* is of little guidance in the action at hand.

A case that is more helpful to the Court is the Ninth Circuit's opinion in *Hancock Laboratories, supra,* which considered whether the exposure or manifestation theory should be applied to damage that arose as a result of the implantation of a faulty heart valve. The *Hancock Laboratories* court analogized the progressive spread of the bacterial infection that resulted from the implanting of the faulty heart valve to

the progressive disease of asbestosis, which results from the exposure to asbestos fibers. The court then ruled that in the context of latent and progressive disease, the "California Supreme Court would adopt the exposure theory to determine when bodily injury occurs." 777 F.2d at 524. The Ninth Circuit went on to state that "it is probable that the California Supreme Court would find the reasoning and results of the Sixth Circuit in *Forty-Eight Insulations* to be correct. An insurer is liable for any period where there was an exposure to an injury causing agent." *Id.* at 525.

This Court, though perhaps not bound by the decision of the Ninth Circuit in *Hancock Laboratories* because that court was not specifically considering the factual matrix of the disease of silicosis, nonetheless must give great deference to the reasoning of that opinion. Therefore, this Court finds that the California Supreme Court would adopt the reasoning and results of the Sixth Circuit in *Forty-Eight Insulations,* and that the California Supreme Court would thereby apply the *Forty-Eight Insulations* opinion to cases in California that raised the issues of the proper trigger of coverage under CGL policies for claims of asbestosis. Given that, the issue for the Court in determining the proper "trigger" of coverage in this action is, as the *Ducre* court pointed out, whether the pathogenesis of silicosis differs from that of asbestosis to an extent that undercuts the reasoning of the courts in *Forty-Eight Insulations* and *Porter.* Because the pathogenesis of the diseases of asbestosis and silicosis are sufficiently similar in the areas of contraction and development, *see* Section III, then under the reasoning of the Ninth Circuit in *Hancock Laboratories* and the California court in *California Union,* this Court is bound to apply the exposure theory for the determination of coverage concerning claims of silicosis under the policies in this action.

As to the policies themselves, the Court finds that crucial terms under the policies, "bodily injury" and "occurrence," are ambiguous in the way they are used in the policies, and are ambiguous in terms of their effect on the application of the poli-

cies to claims of progressive and cumulative diseases. The term "bodily injury" includes *both* "bodily injury" and "disease" in its own definition, rendering unclear exactly what type of injury is contemplated or required. In addition, the use of the term "disease" leaves unclear whether the existence of disease for the purposes of the policies is to be determined in terms of medical diagnosis, or in terms of actual bodily injury. This is especially unclear in the context of asbestosis and silicosis where the diseases themselves have been characterized as "more like a series of injuries than like a disease." *Ducre*, 752 F.2d at 993, *citing Jennings v. Louisiana & Southern Life Insurance Co.*, 290 So.2d 811, 814 (La.1974). The definition of the term "occurrence" is also unclear because it leaves without specific definition the term "results" as it is meant in connection with "bodily injury." For purposes of cumulative disease, when a bodily injury "results" may very well be different from when a disease "results"—indeed, that is at the very heart of the dispute in this action. Thus, the policies are ambiguous in the use of the terms crucial to the resolution of this action.

As stated earlier, under California law there is no dispute that " 'any ambiguity or uncertainty in an insurance policy is to be resolved against the insurer and ... if semantically permissible, the contract will be given such construction as will ... provid[e] indemnity for the loss to which the insurance relates.' ... [In general,] coverage clauses are to be interpreted broadly so as to afford the greatest protection to the insured...." *White*, 40 Cal.3d at 881, 221 Cal.Rptr. at 513, 710 P.2d at 313 (citations omitted). Additionally, there are two general principles that guide the interpretation of insurance policies: "(1) the objective in construing the policies' coverage of liability must be to give effect to the policies' dominant purpose of indemnity; ... (3) the Court should ordinarily strive to give effect to the objectively reasonable expectations of the insured." *Hancock Laboratories*, 777 F.2d at 523, n. 5, *citing* Couch on Insurance 2d, §§ 15:41, 15:14, 15:16, 15:74 (2d ed. Anderson 1959). When interpreting the specific policies at issue, the Court will be guided by the foregoing principles.

## III

Extensive evidence was presented at trial on the issue of the contraction and development, or pathogenesis, of silicosis. The Court found Clemco's expert, Dr. Hans Weill, especially knowledgeable and credible on the explanation of the disease of silicosis, and on the characterization of the disease's effect on the body. It was beyond dispute from the evidence presented that exposure to silica dust is harmful to the human body. However, the extent of the exposure and the length of the exposure necessary for the contraction of silicosis in a specific individual varies. In addition, the insidious nature of silicosis compounds the difficulty of diagnosis, and complicates the process of pinpointing the specific time when the disease "occurred" in a specific individual.

It is possible for an individual to be exposed to a small amount of silica dust for a short period of time and not suffer sufficient "injury" to the lungs to result in silicosis. However, an individual who has been exposed to silica dust in significant doses cannot be sure that he has avoided the disease of silicosis until some fifteen or twenty years have passed without incident. The only certain methods of diagnosing silicosis are the analysis of x-rays and the use of lung biopsies; both methods are unable to detect the disease until long after it has inflicted serious damage to the lungs.

Although the evidence showed that "injury" to the human lungs from exposure to silica dust could occur within thirty minutes of the initial exposure, an individual who contracts silicosis is usually unaware of the fact until diagnosed by a physician. Diagnosis in individual cases generally will not occur until after the individual has experienced severe health difficulties, often not until many years after the individual's initial exposure to the silica dust, and perhaps not until years after the individual's last exposure. Because of the cumulative and progressive nature of the disease, the

diagnosis will not occur until the disease has already begun to develop in the individual's lungs.

The evidence established that the disease of silicosis is a fibrotic or scarring disease of the lung that results from the inhalation of crystalline silica particles in an occupational setting. The inhalation of the particles may or may not injure the tissue in the lung, depending in large part on whether the body's various defense mechanisms are successful in removing the particle from the lung before permanent damage to lung cells occurs. If injury to the lung does occur, the injury may or may not result in the disease of silicosis. The disease of silicosis "might be considered as the sum parts of many, many, or multiple, injurious events." Dr. Weill, Reporter's Transcript, Oct. 2, 1986, at 16. Thus, although injury to the lung may occur, that event alone will not result in silicosis unless there is an accumulation of many "injuries" to the lung so as to interfere with the lung's normal operation. In individuals diagnosed as having silicosis, the "bodily injury" to their lungs occurs very early in their initial exposure, and the "timing" of the disease itself "would be in weeks." Id.

As Dr. Weill testified in great detail, the inhalation of silica particles does not necessarily mean that injury to the lung tissue will occur. The silica must pass through five different bodily defense mechanisms: the nose hairs, the nasal pharynx, the larynx, the trachea, and the mucociliary escalator. The nose hairs will filter out a certain number of the particles, as will the nasal pharynx. After that, a certain number of the particles will be trapped by the larynx and the trachea, never reaching the lung. Finally, a number of the particles will impact upon the mucociliary escalator, essentially the mucous lining of the tracheobronchial tree, and thereafter be expectorated or swallowed, also avoiding the lung. In all, a majority of the particles human beings inhale, including particles of silica dust, are not in fact deposited and retained deep within the lung. This is also true as concerns the inhalation of asbestos fibers, and these fibers must also evade the body's defense mechanisms in order to affect the lung tissue.

If the silica particle does in fact reach the inner lung, that alone does not mean that silicosis will necessarily result. Once a silica particle does reach the inner expanse of the lung, it then initiates a number of concurrent and interrelated processes. As a particle comes into contact with the lung tissue, it inflames the alveolar cells and the cells that compose the endothelial and epithelial layers of the lung. This is due to the toxicity of the silica particles. As this inflammation occurs, it causes "injury" to the lung tissue and defense cells are "called" to the site by the release of the chemical chemotax. These defense cells are called macrophages, and they attempt to engulf the particle and remove them from the lung. At the same time, in reaction to the particles, the cells in the lung also release a chemical called neutrophil, which may lead to further cellular injury in the lung. If the macrophages are successful in removing the particle from the lung, there will be an inflammation in the lung but no "injury" in the form of permanent damage. However, if there is a large dose of silica particles, the macrophages may die or dysfunction in the attempt to engulf too many particles.

If the macrophages die or dysfunction, they release a substance that calls "fibroplasts" to the site of the particles. These fibroplasts are the cells that lay down scar material, or collagen. The laying down of fibroplasts, referred to as fibrosis, constitutes "injury" to the lung in the form of permanent damage. Initially, the collagen is beneficial because it confines and constrains the noxious process of particle inflammation, preventing further damage to the lung tissue and its cellular components. However, as inflammation and tissue injury multiply in response to the further inhalation of the particles, the scar "nodules" grow, and ultimately coalesce and expand. Eventually, if exposure to heavy amounts of silica dust continues, this scarring will grow to cover a significant portion of the lung's wall, and will ultimately lead to an interference with the normal functioning of the lung. This "interference" will manifest

itself in the individual by a shortness of breath, difficulty with exercise, or lung failure.

In addition to the above processes, other chemicals and substances are secreted by certain of the cells discussed above. These substances vary in their effect, some inhibit the genesis of fibrosis, or scarring, and others actually speed up the development. These "regulators" affect the ultimate course of the disease, and its severity. During all of the above processes, cells in the lung may dysfunction or be destroyed as a result of the toxicity of the silica particles. This permanent damage to the cells of the lung also constitutes permanent injury to the individual.

It was emphasized at trial by Clemco's expert, Dr. Weill, that all of the above processes are occurring simultaneously and in varying order: the initial injury as a result of the particle lodging in the lower lung, the inflammation due to the particles initial contact with the lung's cellular wall, the release of various substances and chemicals in reaction to the silica particles presence in the lower lung, and the eventual fibrosis as a result of the lung's inability to remove the particle. The general time frame for the development of the above processes was also outlined by Dr. Weill. Usually, the macrophage arrive in response to the particle's contact with the lung anywhere from hours to days. The development of fibrosis in response to the inability of the macrophage to engulf the particles occurs "certainly by a very few weeks." Reporter's Transcript, Dr. Weill, Oct. 2, 1986, at 23.

Finally, Dr. Weill testified as to the permanence and seriousness of the various "injuries" discussed above. At the stage of "inflammation," when the particles first lodge themselves in the lower lung and the macrophages arrive in response to the release of chemotax, this type of injury to the lung is reversible. If the number of particles in the lower lung is small, the macrophages and other defenses may succeed in removing the particles or engulfing them. However, if the number of particles is large and the lung's defenses are ineffec-

tive, the particles will remain and cause further damage. The next stage, permanent injury to the lung as a result of fibrosis, is irreversible. It is the accumulation of fibrosis, or scarring, on the walls of the lung that is later diagnosed as silicosis through the use of x-rays and lung biopsies. As Dr. Weill concluded from the study of over two hundred individual cases of silicosis, the individuals later diagnosed as having contracted silicosis first suffered "bodily injury" "very early in the course of their initial exposure.... The injury in a disease like silicosis that ultimately produces a diagnosable disease is a cumulative injury. That is, the disease might be considered as the sum parts of ... injurious events. The timing of that would be in weeks." Reporter's Transcript, Dr. Weill, Oct. 2, 1986, at 16.

Although a medical diagnosis of silicosis based on the development of sufficient fibrosis in an individual's lungs may not be possible until many, many years after the individual's initial heavy exposure, the development of permanent fibrotic damage that will pave the way for the progression of silicosis will occur in a matter of weeks after the initiation of heavy exposure. See Reporter's Transcript, Dr. Weill, Redirect, Oct. 2, 1986, at 103. Thus, in an individual who is exposed to heavy doses of silica particles, and who is later diagnosed as having silicosis, it is clear that the individual suffered permanent and irreversible injury to his lungs in the form of fibrosis within the first few weeks of exposure. It is also clear that for that individual, the disease of silicosis has "occurred" within the first few weeks of exposure.

Commercial argued that there could be no certainty that the disease was present in the individual and, thus, had "occurred," for purposes of coverage under the policies, until the individual was diagnosed as having silicosis. However, the disease must have "occurred" well before the actual diagnosis if the impetus for the visit to the physician was the fact that the individual suffered from serious health deficiencies as a result of the disease. As the court in *Forty-Eight Insulations, supra,* noted in discussing the closely analogous

disease of asbestosis, "there is universal medical agreement that the time when asbestosis manifests itself is not the time when the disease occurred." 633 F.2d at 1219. The point at which diagnosis is actually made, or in Commercial's terms the disease "manifests" itself, is due more to the individual's medical idiosyncrasies, and the individual's determination of how severe the symptoms have to be in order to justify a medical visit, than to the point at which the disease first develops or "occurs." The expert in the *Forty-Eight Insulations* case made a similar observation as Dr. Weill, Clemco's expert:

> Suppose a man never goes to see anybody or never has a chest [x-ray] film made or anything else done until he is far advanced and the diagnosis is then made on that date. Well, nobody, I think, would ask you to believe that [that date] is when the disease began. That is when the diagnosis was made, but [it is not when the disease began because the actual date of the diagnosis] was a temporal phenomenon based on things having nothing to do with tissue injury; namely, when did the man [decide to] go see a doctor so the diagnosis could be made?

633 F.2d at 1219. This dichotomy between "occurrence" and "diagnosis" points up the fallacy of adopting the "manifestation" theory as the trigger for coverage under the policies at issue. The pathogenesis of the disease of silicosis makes clear that, for an individual diagnosed as having silicosis, the disease "occurs" shortly after exposure to the silica dust.

In the cases examining the pathogenesis of asbestosis, the courts have uniformly concluded that the disease of asbestosis is a "progressive disease" resulting from the continued inhalation of asbestos fibers. *See Borel v. Fibreboard Paper Products Corp.*, 493 F.2d 1076 (5th Cir.1973); *Commercial Union, supra.* The courts have also found that the "injury" to the lungs results from "each tiny deposit of scar-like tissue" in the lungs. *Forty-Eight Insulations*, 633 F.2d at 1217, *citing* (trial court below) *Insurance Co. of North America v. Forty-Eight Insulations, Inc.*, 451 F.Supp.

1230, 1239 (E.D.Mich.1978). As the Sixth Circuit noted in *Forty-Eight Insulations*, the medical testimony is undisputed that "injury, in the sense that there is tissue damage, occurs shortly after the initial inhalation of asbestos fibers." 633 F.2d at 1218. Thus, the Sixth Circuit concluded that the district court was correct in finding that "[b]ecause each additional inhalation of asbestos fibers results in the build-up of additional scar tissue in the lungs, ... 'bodily injury' [for purposes of insurance coverage] occur[s] *whenever* asbestos fibers [are] inhaled." *Id.* (emphasis added).

The Court finds that the pathogenesis of silicosis is similar to that of asbestosis in all relevant respects for purposes of determining the proper "trigger" of coverage under the policies at issue. The characterization of the disease of asbestosis by the court in *Forty-Eight Insulations* is consistent with the evidence at trial describing the pathogenesis of the disease of silicosis and the subclinical processes that lead to its eventual manifestation. Although silicosis differs from asbestosis in some respects, the most important being that it is possible for particles of silica to be removed from the lungs by the body's defenses, the similarities between the two diseases are overwhelming. Both diseases involve the injury to the lungs from the inhalation of toxic materials; both diseases result from the body's exposure to the toxic materials in heavy amounts, which ultimately leads to an overwhelming of the body's defenses and the advanced development of fibrosis of the lungs; and both are insidious diseases with long latency periods during which they remain largely undetected, even though serious injury to the lungs is continuing at a cumulative and progressive rate. Additionally, it was undisputed at trial that the inhalation of both silica and asbestos trigger similar reactions in the cellular materials of the lungs, and initiate similar chemical and cellular responses.

The Court finds that the pathogenesis of silicosis and asbestosis are sufficiently similar to justify similar treatment in choosing the proper trigger for insurance coverage under the policies at issue. Therefore, the

Court adopts the reasoning of the Ninth Circuit in *Hancock Laboratories,* and the Sixth Circuit in *Forty-Eight Insulations,* and finds that under the policies at issue, the "exposure theory" will be the proper trigger of coverage. In individuals who have been diagnosed as having silicosis, coverage is triggered for any period where the individuals were exposed to silica particles. This theory of coverage is consistent with the pathogeneisis of the disease of silicosis, provides the only workable theory of liability in cases such as this where the "bodily injury" results from an insidious disease with very long latency periods, and is consistent with the California law on the interpretation of insurance contracts that requires that coverage clauses be construed broadly.

## IV

■ Both Clemco and Commercial presented extensive evidence and testimony on the issue of whether Clemco expected or intended the losses for which it now seeks coverage, losses resulting from the suits filed against Clemco by former sandblasters who have contracted silicosis. Commercial's evidence consisted primarily of eliciting testimony from Clemco's former management that they were aware of some relationship between sandblasting and silicosis as early as 1956, that they were aware that their products were being used in an unsafe manner by some individuals as early as 1956, and that they were aware of the shortcomings of the protection provided by their canvas sandblast hood products as early as 1957. Commercial also produced numerous early sales brochures, and the transcripts of meetings of the management of Clemco concerning the safety of their products.

Clemco showed through the testimony of prior employees that it had never actually anticipated that sandblasters would contract silicosis while using its equipment. Clemco also showed that it was never aware of the direct connection between exposure to silica dust and silicosis, or was aware that it might at some point in the future be subject to lawsuits alleging that its equipment failed to prevent silicosis.

Clemco was in fact a leader in its field in providing information concerning the safe use of its equipment to salesmen as well as to the ultimate user. The evidence also showed that Commercial prepared "engineering reports" each year to update its assessment of Clemco's potential liability. These reports surveyed the state of Clemco's business and the products it manufactured, and were updated each year. Commercial's own reports as late as 1972 failed to anticipate any new potential for liability in connection with Clemco's products, or the emergence of silicosis claims against Clemco. Finally, Professor Temple, Clemco's insurance expert, in response to hypothetical questions from both Clemco's counsel and Commercial's counsel, stated that given the factual scenario presented by the history of Clemco's activities and knowledge, Clemco did not "expect or intend" the losses for which it now seeks coverage.

The Court finds that Commercial has failed to carry its burden in showing that Clemco either expected or intended the losses for which it now seeks coverage. Clemco did not expect or intend that the users of its products would contract silicosis, or that these users would file suits against Clemco alleging that its products failed to protect against silicosis.

■ Clemco also asked the Court to determine the apportionment of coverage among multiple insurers in a situation such as the present. The apportionment of coverage among multiple insurers at risk during the exposure period will be governed by the reasoning of the courts in *Hancock Laboratories* and *Forty-Eight Insulations.* The Ninth Circuit has expressly approved of the Sixth Circuit's ruling that "each time the injured breathed asbestos, there was exposure, and all insurance companies which had provided coverage at the time of an exposure were liable." *Hancock Laboratories,* 777 F.2d at 525, and n. 10, discussing *Forty-Eight Insulations,* 633 F.2d at 1225. As already stated, the diseases of asbestosis and silicosis are identical in all relevant respects for the purposes of insurance coverage. Therefore,

under the policies issued by Commercial, Commercial is liable for those claims submitted by the injured parties who were exposed to silica dust during the period Commercial was at risk. Commercial is liable for every otherwise valid claim resulting from exposure during a period in which Commercial was at risk, regardless of whether another insurer was also at risk or had been at risk longer.

## V

Clemco has also brought a claim against Commercial alleging that Commercial's refusal to share in the defense and indemnification of Clemco for the suits filed against Clemco was in bad faith. As a preliminary matter, Clemco has before the Court two motions brought at the close of trial: (1) to exclude, under Federal Rule of Evidence 408, any and all evidence submitted by Commercial that would go to show the existence of settlement offers or negotiations on behalf of Commercial in this case; and (2) to exclude any and all evidence submitted by Commercial that would go to show that it relied upon counsel in good faith in its refusal to defend or indemnify Clemco in the underlying silicosis suits brought by injured sandblasters.

Under Federal Rule of Evidence 408, any evidence concerning settlement negotiations or offers from one party to another are inadmissible. The policy behind this rule is to encourage "freedom of communication with respect to compromise" by preventing the presentation of either party's statements made during negotiations. Fed.R.Evid. 408 advisory committee's note. The rule applies directly to the situation at hand. Commercial argues that the evidence of settlement offers is crucial to negate Clemco's claim of bad faith, and relies on the California case of *White, supra.* Commercial fails to note that Clemco's claim focuses on Commercial's consistent refusal to participate in coverage agreements with the remainder of Clemco's insurers. More important, Commercial fails to recognize that "if a Rule of Evidence covers a disputed point of evidence, the state law is pertinent only if and to the extent the Rule makes it so." 19 C. Wright

& A. Miller, Federal Practice & Procedure § 4512 at 190 (1982). Because the Federal Rules of Evidence "were enacted directly by Congress, their validity vis-a-vis state law and the principles of the *Erie* doctrine stand on even firmer ground than that of the Rules of Civil Procedure." *Id.* at 192. Commercial's citing of California law is unpersuasive; all evidence presented by Commercial concerning settlement offers or negotiations is excluded under the provisions of Rule 408.

Clemco also moved that all evidence concerning Commercial's reliance on counsel in denying coverage should be excluded because Commercial failed to affirmatively plead the defense of reliance on counsel as required under the spirit of Rule 8 of the Federal Rules of Civil Procedure. Clemco claimed that Commercial's failure to affirmatively plead this defense prejudiced it during discovery because it was never alerted to the possible impropriety of Commercial's assertion of the attorney-client privilege, and also prejudiced Clemco at trial because it was unfairly "surprised" by this defense. The Court and the parties were unable to find a single case directly on point in the federal or state case law. *But see Bertero v. National General Corp.,* 13 Cal.3d 43, 118 Cal.Rptr. 184, 529 P.2d 608 (1974) (*en banc*) (the defense on reliance of counsel in an action for malicious prosecution is an affirmative pleading). The Court notes that Rule 8(c) of the Federal Rules of Civil Procedure lists nineteen specific affirmative defenses, and does not mention reliance on counsel as an affirmative defense. Similarly, Wright & Miller list over twenty additional affirmative defenses that have been used by the federal courts for purposes of Rule 8(c), and the defense of reliance on counsel is not among them. 5 C. Wright & A. Miller, Federal Practice and Procedure, Civil § 1271 at pp. 305–08 (1982). Even if persuasive state law on point were found, the Court is not "bound to treat a matter that is considered an affirmative defense under state law as an affirmative defense for purposes of pleading under Rule 8(c)." *Id.* at 309.

■ Although the Court believes that the defense of reliance on counsel is not an affirmative defense under the Federal Rules of Civil Procedure so as to require affirmative pleading, the issue is not reached. Clemco should have been aware at least as early as January 8, 1986, when Commercial submitted a list of witness narratives for trial, that Commercial's discussions with counsel, and the reliance on legal opinion as to the trigger of coverage under the policies, would be an issue for trial. If Clemco read the list and the narratives closely, it would have recognized the centrality of the issue, and then could have filed a motion challenging the assertion of the attorney-client privilege. *See Handguards, Inc. v. Johnson & Johnson,* 413 F.Supp. 926 (N.D.Cal.1976). Clemco failed to raise this objection until near the close of trial, after Commercial had already presented numerous witnesses and elicited significant testimony going to show reasonable reliance on counsel in denying coverage. Clemco cross-examined each witness, and presented rebuttal evidence. It failed to raise the objection of unfair surprise until after the presentation of the majority of evidence at trial. The Court, therefore, finds that Clemco waived the objection, did not suffer surprise rising to the level of prejudice, and did in fact try the issue and Commercial's evidence by consent as contemplated by Federal Rule of Civil Procedure 15(b). *See* 6 C. Wright & A. Miller, Federal Practice & Procedure, §§ 1492–1493 at 470–74 (1982). Clemco's motion to exclude evidence of Commercial's reliance on counsel is denied.

■ The evidence at trial established that Commercial was not acting in bad faith when it insisted on the application of the "manifestation" theory of coverage for the policies issued to Clemco. As this Opinion makes clear, the law in the federal courts, and especially in the California courts, is unsettled and unclear as to the proper trigger of coverage in claims involving silicosis. Commercial, independently and in reliance on the opinion of counsel, concluded that it was reasonable and prudent to assert the position that coverage for latent and insidious diseases, like silicosis, would not be triggered until manifestation of the disease. Both sides presented testimony on the effect and the significance of the decisions in *Porter, supra,* and *Ducre, supra.* It was clear from the testimony of both Lillian Beckett, an attorney employed as in-house counsel by Commercial, and Craig Nelson, an attorney employed by Clemco to handle silicosis lawsuits in New Orleans, that significant differences of opinion existed as to the effect of those decisions both within the various states of the Fifth Circuit, and states outside the Fifth Circuit.

Commercial did not act in bad faith merely by refusing to embrace the "exposure" theory when the trend of authority appeared to be heading in that direction. As is apparent from the Opinion and Order of this Court, there was ample room for intelligent disagreement on the choice between the "exposure" theory and the "manifestation" theory as concerns the policies at issue. Commercial should not be held liable for a difference of opinion. It did not act unreasonably, with intent to avoid clear obligation, or with any intent to deny Clemco coverage under the policies without justification. Therefore, Clemco's claim alleging bad faith on the part of Commercial by its refusal to participate in the defense or indemnification of Clemco is denied.

## VI

In view of the evidence presented, and the discussion of the applicable authority, the Court finds that under the policies issued by Commercial to Clemco, the trigger of coverage for claims involving silicosis is any period when the victim was exposed to silica particles. The Court also finds that Clemco neither expected nor intended the potential for its liability as a result of the manufacture of its products. Finally, the Court finds that Commercial did not act in bad faith by refusing to adopt the "exposure" theory as opposed to the "manifestation" theory in determining Clemco's coverage under the policies issued.

The foregoing constitutes the findings of fact and conclusions of law required by Federal Rule of Civil Procedure 52.

Clemco shall submit to the Court a judgment in form approved by Commercial on or before May 15, 1987.